2016 IL App (1st) 141660

SECOND DIVISION
December 27, 2016

No. 1-14-1660

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 98 CR 23340 |
| TONY GONZALEZ, | ) | The Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justice Mason concurred in the judgment and opinion.
Presiding Justice Hyman dissented, with opinion.

**OPINION**

¶ 1 Petitioner Tony Gonzalez appeals from the trial court's second-stage dismissal of his amended petition for postconviction relief brought pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2010)). Gonzalez asks this court to reverse the dismissal of his amended postconviction petition asserting claims of actual innocence and a *Brady* violation and requesting remand for a third-stage evidentiary hearing.

¶ 2 BACKGROUND

¶ 3 Following a 1999 jury trial, Gonzalez was convicted of one count of first degree murder and two counts of attempted murder. Before trial, petitioner moved to suppress the identification testimony of two State witnesses, Luis Marrero and Yesenia Rodriguez, asserting that the lineup composition was suggestive. The trial court denied the motion. On appeal, this court reversed

Gonzalez's convictions and remanded for a new trial based on the submission of an erroneous jury instruction regarding the evaluation of eyewitness identification testimony. *People v. Gonzalez*, 326 Ill. App. 3d 629 (2001).

¶ 4    The following is a summary of the evidence outlined in our order affirming Gonzalez's conviction following his 2003 trial. *People v. Gonzalez*, No. 1-03-1286 (2006) (unpublished order under Supreme Court Rule 23). On July 23, 1998, Marrero, Hector Rivera, and Waldemar Nieves spent the evening drinking at a bar in the Humboldt Park neighborhood in Chicago. In the early morning hours of July 24, they left the bar and went to Nieves' house a block away. Nieves went to bed but Marrero and Rivera stayed with Nieves' 15-year-old sister, Rodriguez, who had been dating Marrero for two months, and Illuminata Nieves, Rodriguez's mother. Marrero left the apartment twice to buy more alcohol. Rodriguez and Marrero left the apartment at 2 a.m., arguing about Marrero's excessive alcohol consumption. They were standing at the corner of the apartment building when a man with a gun came out of the alley and shot at them, hitting Marrero twice.

¶ 5    Marrero testified that when he and Rodriguez were arguing in the alley, he was facing Rodriguez and had his back to the gunman, who shouted "Jiver killer." Marrero turned around and faced the gunman who had a t-shirt on the top of his head. When Marrero was shot, he fell to the ground, facing the shooter, and was shot a second time. The man ran into the apartment building.

¶ 6    Inside the apartment, the gunman shot Rivera and Illuminata, then returned to the alley and shot Marrero a third time in the back as he lay on the ground. Marrero testified this gave him another opportunity to see the shooter's face. He then pointed the gun at Rodriguez but she

begged him not to shoot. He struck Rodriguez in the head with the butt of his gun. Rivera later died from his injuries.

¶ 7    A couple of days after the shooting, Detective Reynaldo Guevara visited Marrero at the hospital and showed him a photographic array of six pictures of Hispanic men. Gonzalez's picture was the only one with numbers visible underneath his face and a white background. The other five pictures had dark backgrounds and no numbers visible. Marrero identified Gonzalez as the gunman. Marrero testified that he told police the gunman had a "spot" by his neck after he saw the photo array. He also told the officers that the shooter had a gold tooth. On cross-examination, Marrero denied that the arrest placard under petitioner's photo or the white background influenced his selection of petitioner's photo. About two weeks later, Marrero identified Gonzalez in a police lineup. Marrero testified he had seen Gonzalez in the neighborhood but did not know his name or if he belonged to a gang. Marrero stated no one in Nieves' apartment on the night of the shooting, including himself, was affiliated with a gang. The neighborhood store sold shiny wraps used to cover a tooth to resemble a gold tooth.

¶ 8    Rodriguez gave an account of the shooting that was consistent with Marrero's version including that the gunman had shouted "Jiver killer." She stated that police who responded to the scene interviewed her in Spanish. She told police the shooter was a male Hispanic and denied telling the police the shooter was a "black Hispanic" or that the shooter had obscured his face. She did not notice that the shooter had a gold tooth or a birthmark.

¶ 9    The parties stipulated that two hours after the shooting Marrero's blood alcohol level was 88 milligrams per deciliter; a normal range is less than 10 milligrams per deciliter.

¶ 10    Detective Guevara, who also testified at Gonzalez's first trial, stated he was a gang crimes specialist assigned to a violent crime unit. He stated the Latin Jivers and the Spanish Cobras were

rival gangs in the area where the shooting occurred. The day after the shooting, Guevara interviewed Rodriguez at her apartment. She told him that the shooter had a white t-shirt tied around his head that did not conceal his face. Rodriguez also told him that the gunman had shouted "Jiver killer." Knowing the two gangs were at war, Guevara brought Rodriguez to the police station and showed her a book of photographs of members of the Spanish Cobras gang. She identified Gonzalez's photograph on page 36 of the 37-page Spanish Cobras book.

¶ 11    Guevara interviewed Marrero while he was in the hospital and showed him an array of about six photos from which Marrero selected Gonzalez as the gunman. Guevara stated Marrero told him the shooter had a birthmark, but Guevara did not include this statement in his police report.

¶ 12    Gonzalez was arrested two weeks later. Guevara arranged a lineup where Rodriguez and Marrero separately identified Gonzalez. Guevara testified Rodriguez and Marrero were together for about ten minutes before looking at the lineup but did not interact during their separate viewings of the lineup. Guevara admitted this was not good police procedure, although he did not "see anything wrong with that." Gonzalez was the only individual who was in the lineup whose picture was in the photographic array.

¶ 13    For the defense, a dentist testified she reviewed Gonzalez's dental records and examined his mouth; he had not had any front teeth prepared for a crown. *People v. Gonzalez*, 2011 IL App (1st) 093016-U, ¶ 9.

¶ 14    The jury convicted Gonzalez of first degree murder of Rivera and attempted murder of Marrero and Illuminata. He was sentenced to consecutive terms of 30 years' incarceration for murder and six years' incarceration on each of the attempt murder convictions, for a total of 42 years.

¶ 15    On direct review, this court affirmed. See *People v. Gonzalez*, No. 1-03-1286 (2006) (unpublished order under Supreme Court Rule 23). In rejecting petitioner's argument that the evidence was legally insufficient to sustain his conviction, we found Marrero and Rodriguez "confidently and independently" identified petitioner one to two days after the shooting. Each made multiple identifications of petitioner after having "multiple opportunities to observe the face of the shooter from just a few feet away," and gave a description of the shooter that described the petitioner. Although there were differences, "their testimonies were corroborative in several ways." We further noted that defense counsel "made sure the jury was aware of the discrepancies between the eyewitnesses' testimonies and various police reports, the purported suggestiveness of the photographic and lineup identifications, and the fact Marrero had been drinking before the shooting." Finally, we concluded that "given the fact that Rodriguez reliably testified that Gonzalez was the shooter and that Marrero corroborated most of the details of her testimony, the evidence against petitioner was not closely balanced." *People v. Gonzalez*, No. 1-03-1286 (2006) (unpublished order under Supreme Court Rule 23).

¶ 16    On August 2, 2009, Gonzalez filed a *pro se* postconviction petition pursuant to section 122-1 of the Act (725 ILCS 5/122-1 *et seq.* (West 2010)) asserting his innocence. In the petition, Gonzalez stated that on June 26, 2009, he obtained newly discovered evidence rising to the level of actual innocence when he read a news report of a federal wrongful conviction case won by Juan Johnson on June 23, 2009, against the City of Chicago involving witness intimidation by Chicago police detective Reynaldo Guevara. Attached to Gonzalez's petition were a photocopy of the photographic lineup viewed by Marrero and a transcript of Guevara's testimony at his trial.

¶ 17    In October 2009, the trial court dismissed the petition at the first stage as frivolous and patently without merit. Gonzalez appealed, contending his petition stated the gist of a claim of

actual innocence based on newly discovered evidence sufficient to survive the first stage of postconviction review. In July 2012, this court reversed the summary dismissal, finding that Gonzalez's postconviction petition should proceed to the second stage of review because his claim of actual innocence was "not based on a fanciful factual allegation or an indisputably meritless legal theory." *Gonzalez*, 2011 IL App (1st) 093016-U, ¶ 19.

¶ 18    Through counsel, Gonzalez filed an amended postconviction petition, alleging that he was deprived of his due process rights because newly discovered evidence of his actual innocence demonstrated Guevara engaged in a pattern and practice of framing suspects by orchestrating false identifications and that the State failed to tender exculpatory evidence of Guevara's complaint history prior to Gonzalez's retrial in 2003 in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He also argued that his trial counsel was ineffective for failing to investigate Detective Guevara's history of misconduct. Gonzalez attached an affidavit from retired Chicago police Detective William Dorsch who testified that between 1971 and 1985 he served as a gang crimes officer and at one time worked a homicide case with Guevara. Also attached were documents relating to other cases alleging misconduct by Guevara and a photocopy of the six head shot photographic array that Guevara showed Marrero. Notably, the amended petition and attached exhibits did not include any affidavits from Marrero or Rodriguez or any other person involved in the investigation or trial that resulted in petitioner's conviction.

¶ 19    On May 15, 2014, the trial court granted the State's motion to dismiss Gonzalez's amended postconviction petition stating, "I find the Petitioner has not established the prerequisite standard for relief under the Postconviction Act. One of the factors is that there's no affidavits, and also there has not been an actual, the actual innocence claim has not been supported by sufficient evidence." It is from this order that Gonzalez now appeals.

¶ 20                                    ANALYSIS

¶ 21    First, we consider whether Gonzalez's amended postconviction petition made a substantial showing of actual innocence that entitles him to a third-stage evidentiary hearing.

¶ 22    The Act provides a process by which a criminal defendant may challenge his or her conviction. 725 ILCS 5/122-1 *et seq.* (West 2010). A postconviction proceeding is a collateral attack upon the prior conviction and affords only limited review of constitutional claims not presented at trial. *People v. Greer*, 212 Ill. 2d 192, 203 (2004). A postconviction action is "not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994). The purpose of the postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, nor could have been, adjudicated previously on direct review. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999). A postconviction petition is a collateral proceeding and not a chance to relitigate a defendant's innocence or guilt. *People v. Lucas*, 203 Ill. 2d 410, 417-18 (2002).

¶ 23    To obtain relief under the Act, a petitioner must show there was a substantial deprivation of his or her constitutional rights in the proceedings that produced the conviction. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). The Act "provides for postconviction proceedings that may consist of as many as three stages." *Id.* at 472.

¶ 24    At the first stage, the trial court reviews the petition and may summarily dismiss it if the court determines it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010); *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). In this case, we reversed the summary dismissal of Gonzalez's petition at the first stage and remanded for second-stage proceedings noting "the petition sets forth sufficient facts and a legal theory that arguably support a constitutional claim." *Gonzalez*, 2011 IL App (1st) 093016-U, ¶ 29. At the second stage, counsel

is appointed and the State may move to dismiss the petition. See *People v. Rivera*, 2014 IL App (2d) 120884, ¶ 7. At the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *Id*. All well-pleaded facts not positively rebutted by the trial record are taken as true. *Id*. If a substantial showing of a constitutional violation is made, the petition advances to the third stage for an evidentiary hearing; if not, the petition is dismissed. *Id*. At the third stage, the trial court hears evidence and determines whether, based on that evidence, the petitioner is entitled to relief. *People v. Chatman*, 357 Ill. App. 3d 695, 698 (2005); *People v. Garcia*, 2015 IL App (1st) 131180, ¶¶ 46-47.

¶ 25    We review *de novo* the dismissal of petitioner's amended postconviction petition at the second stage. *People v. Suarez*, 224 Ill. 2d 37, 42 (2007). We may affirm the dismissal based on any reason supported by the record because we review the judgment, not the trial court's reasoning. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010).

¶ 26                                    Actual Innocence

¶ 27        Gonzalez argues that the trial court erred when it dismissed his amended postconviction petition without an evidentiary hearing where his petition sufficiently alleged facts to support his claim of actual innocence based on the newly discovered evidence that Detective Guevara engaged in a pattern and practice of framing suspects by orchestrating false identification evidence against them.

¶ 28    A claim of actual innocence is not the same as a claim of insufficiency of the evidence or reasonable doubt or mere impeachment of trial witnesses, but a claim of vindication or exoneration. *People v. House*, 2015 IL App (1st) 110580, ¶¶ 41, 46. To succeed on a claim of actual innocence, the petitioner must present new, material, non-cumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475,

489 (1996); *People v. Sanders*, 2016 IL 118123, ¶ 24. "Conclusive" means the new, material, non-cumulative evidence, considered with the trial evidence, would "probably lead to a different result." *People v. Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* ¶ 97. See *People v. Davis*, 2012 IL App (4th) 110305, ¶ 62 ("New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial."). Evidence is (i) new if it was "discovered after trial and could not have been discovered earlier through the exercise of due diligence," (ii) material if it is "relevant and probative of the petitioner's innocence," and (iii) noncumulative if it adds to the evidence heard at trial. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 29    Ignoring for a moment the lack of evidence to support any wrongdoing by Detective Guevara in this case, Gonzalez's actual innocence claim suffers from a fundamental problem. A freestanding claim of actual innocence requires just that—a freestanding claim.

> "Under the due process clause of the Illinois Constitution of 1970 (Ill. Const. 1970. art. I, § 2), a [petitioner] can raise in a post-conviction proceeding a 'free-standing' claim of actual innocence based on newly discovered evidence. [Citation.] A free-standing claim of innocence means that the newly discovered evidence being relied upon 'is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.' [Citations.]" *People v. Orange*, 195 Ill. 2d 437, 459 (2001) (quoting *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998)).

¶ 30    Here, Gonzalez is offering newly discovered evidence—Guevara's pattern of coercing, improperly influencing, and intimidating witnesses in other cases—to supplement his assertion that the State committed a *Brady* violation in this case, while at the same time using this evidence

to support his claim of actual innocence. This is impermissible because "the evidence being relied upon to support a freestanding claim of actual innocence" cannot be "used to supplement an assertion of a constitutional violation with respect to defendant's trial." *People v. Brown*, 371 Ill. App. 3d 972, 984 (2007). As a result, Gonzalez's actual innocence claim fails.

¶ 31    Even if we were to consider the merits of Gonzalez's actual innocence claim, he would fare no better. With respect to any claim made in a postconviction petition, section 122-2 of the Act instructs that a postconviction petition shall have attached thereto affidavits, records, or other supporting evidence, or shall state why the same are not attached. 725 ILCS 5/122-2 (West 2014). The purpose of section 122-2 of the Act is to establish that the verified allegations in the petition are capable of objective or independent corroboration. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). A petitioner's failure to either attach the necessary "affidavits, records, or other evidence or explain their absence is fatal to a post-conviction petition [citation] and by itself justifies the petition's summary dismissal." (Internal quotation marks omitted.) *Id*. at 255.

¶ 32    Gonzalez's amended petition contained numerous affidavits from individuals who were not involved in any way with this particular case and numerous transcripts of testimony from other hearings and trials, again not related to this case. The record filed in this court contains seven volumes of the appendixes attached to Gonzalez's amended postconviction petition. This voluminous record establishes exactly what postconviction counsel intended for it to establish—a pattern of pervasive misconduct on the part of Detective Guevara—yet it is completely devoid of any verified allegations capable of objective or independent corroboration that either of the two primary witnesses in petitioner's case, Marrero and Rodriguez, were improperly influenced by Guevara sufficient to warrant a third-stage evidentiary hearing under the Act.

¶ 33    For example, Gonzalez included an affidavit from Officer Dorsch who stated that in the late 1980s or early 1990s he worked on a homicide case with Guevara. They arranged a photographic array of possible suspects for two juvenile witnesses. When one of the witnesses hesitated selecting a photo, Dorsch witnessed Guevara point to one of the photographs and told the witness "that's him." Dorsch was concerned and called felony review but they approved the charges after independently interviewing the witness. The next day, Dorsch talked to the juvenile about the seriousness of the charges and the importance of his identification. The juvenile admitted he had not actually witnessed the shooting. Dorsch immediately contacted the assistant State's Attorney and all charges against the suspect were dropped the next day.

¶ 34    Gonzalez's appendices also led us to review relevant Illinois case law that confirms that Detective Guevara engaged in a pattern and practice of manipulating witnesses. One of the earlier cases critical of Guevara's conduct is *People v. Johnson*, 272 Ill. App. 3d 479 (1995). After a bench trial, Juan Johnson was convicted of first degree murder and sentenced to 30 years' imprisonment.

¶ 35    After a party at a nightclub with over 200 attendees, many of whom were members of "friendly" street gangs, several fights broke out. *Johnson*, 272 Ill. App. 3d at 481-82. The victim died after being beaten with a piece of lumber. The prosecution's witness, Juan Michel, did not speak to police on that night but Guevara contacted him the following day to recount his memory of the incident and to look through "gang books" at the police station. *Id*. at 482. Michel identified Johnson's photo from the "gang book" and identified him in a lineup as having beaten the victim. *Id*. Another witness viewed a lineup with Guevara and identified Johnson. *Id*. at 483. At trial, however, the witness was reluctant to place Johnson at the scene of the beating and

testified that he was more certain the day after the incident when he identified Johnson at a lineup conducted by Guevara than he was at trial. *Id.* at 485.

¶ 36 On direct review, this court affirmed the convictions but remanded, directing the trial court to allow Johnson and his codefendants to file postconviction petitions and conduct a hearing on their claim of ineffective assistance of counsel. *Id.* at 489. After his release from prison, Johnson filed a wrongful conviction lawsuit against the City of Chicago and Guevara, whom Johnson alleged framed him for the 1989 murder.

¶ 37 More recently, this court decided companion cases involving Guevara misconduct and witness coercion: *People v. Montanez*, 2016 IL App (1st) 133726 and *People v. Serrano*, 2016 IL App (1st) 133493. Jose Montanez and Armando Serrano were convicted of murder in 1994 and filed appeals from directed findings entered against them at the close of their postconviction third-stage evidentiary hearing. The petitions were based on an affidavit from the principal witness at trial who swore that his testimony was "false in all respects" and was coerced by Detective Guevara. (Internal quotation marks removed.) *Montanez*, 2016 IL App (1st) 133726, ¶¶ 11-12; *Serrano*, 2016 IL App (1st) 133493, ¶¶ 11-12. We held that Montanez and Serrano met their burden to proceed with their actual innocence claims and reversed and remanded to the trial court to adjudicate the reinstated third-stage postconviction proceedings. *Montanez*, 2016 IL App (1st) 133726, ¶ 46; *Serrano*, 2016 IL App (1st) 133493, ¶ 47.

¶ 38 There was no physical evidence or eyewitness testimony presented at Montanez's or Serrano's trial. *Montanez*, 2016 IL App (1st) 133726, ¶ 10; *Serrano*, 2016 IL App (1st) 133493, ¶ 10. Francisco Vicente, the main witness for the prosecution, was an admitted drug addict who had four felony cases pending against him. *Montanez*, 2016 IL App (1st) 133726, ¶ 6; *Serrano*, 2016 IL App (1st) 133493, ¶ 6. Vicente allegedly told Guevara that Montanez confessed his

crime to him. *Montanez*, 2016 IL App (1st) 133726, ¶ 6; *Serrano*, 2016 IL App (1st) 133493, ¶ 6. The trial judge, when making his ruling, remarked "were it not for the testimony of Vicente, there wouldn't have been much evidence here. His testimony is crucial." (Internal quotation marks omitted.) *Montanez*, 2016 IL App (1st) 133726, ¶ 10; *Serrano*, 2016 IL App (1st) 133493, ¶ 10.

¶ 39    But in 2004, Vicente submitted an affidavit stating that his trial testimony was " 'false in all respects' " and his testimony was coerced by Detective Guevara. *Montanez*, 2016 IL App (1st) 133726, ¶ 11; *Serrano*, 2016 IL App (1st) 133493, ¶ 11. Specifically, Vicente said that Detective Guevara threatened, physically coerced, and promised him leniency for his crimes in exchange for implicating Montanez and Serrano for murder. *Montanez*, 2016 IL App (1st) 133726, ¶ 11; *Serrano*, 2016 IL App (1st) 133493, ¶ 11. In addition, Vicente averred that he received money and special treatment in prison for supplying false testimony for Guevara. *Montanez*, 2016 IL App (1st) 133726, ¶ 11; *Serrano*, 2016 IL App (1st) 133493, ¶ 11. At the 2013 postconviction evidentiary hearings, Detective Guevara invoked his fifth amendment right and refused to answer questions on the basis that he might incriminate himself. *Montanez*, 2016 IL App (1st) 133726, ¶ 13; *Serrano*, 2016 IL App (1st) 133493, ¶ 30.

¶ 40    This court, in remanding Montanez's case to the trial court, noted, "In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." (Internal quotation marks omitted.) *Montanez*, 2016 IL App (1st) 133726, ¶ 34 (quoting *People v. Reyes*, 369 Ill. App. 3d 1, 21 (2006)). Significantly, the *Montanez* court noted the following:

"Petitioner called witnesses and introduced other sworn testimony at the evidentiary hearing in an attempt to establish Guevara's pattern of police misconduct. William Dorsch, a retired Chicago police department detective, testified about a case he worked on

with Guevara a couple of years before this case came about. In that case, the detectives were conducting a photographic lineup with two supposed eyewitnesses. Dorsch testified that when one of the witnesses seemed unable to make an identification, Guevara pointed to one of the pictures and said 'that's him.' The witness then agreed with Guevara's suggestion and went on to identify the person in a live lineup. Dorsch conducted the lineup with the second witness by himself, and the witness was unable to make an identification. The witnesses later admitted that their statements were false and that they were being paid by a third party. The charges against the accused were dropped. Dorsch, however, did not remember many of the particulars of the case such as the names of those involved. Dorsch also never reported the incident to his superiors and had since begun to work as an investigator with the Innocence Project and received compensation for his work." *Montanez*, 2016 IL App (1st) 133726, ¶ 16.

¶ 41     And in *Serrano*, we again noted that the only direct evidence of guilt was the State's witness Vicente's testimony and observed:

"At the [evidentiary] hearing, Detective Guevara invoked his fifth amendment right, refusing to answer any questions on grounds that he might incriminate himself. When questioned in detail about the allegations of misconduct in this investigation, Guevara refused to answer each question, invoking his fifth amendment protections. Similarly, Vicente invoked the fifth amendment and refused to give testimony to backup his sworn recantation. There were several indications that he feared prosecution for having previously perjured himself at defendants' trial. Vicente did not take the opportunity to repudiate the content of the affidavit. Vicente told the court that he feared for his safety and he was escorted from the building." *Serrano*, 2016 IL App (1st) 133493, ¶ 14.

¶ 42    *Serrano* also noted that the petitioner offered into evidence a statement from another witness that corroborated claims that Guevara used violence and other inducements to obtain false testimony from the purported witness against Serrano and Montanez. *Id*. ¶ 15.

¶ 43    On July 20, 2016, Cook County prosecutors dropped murder charges against Serrano and Montanez. Steve Schmadeke, *2 Men Released After 1993 Murder Charges Dropped: 'It's been a lot of pain,'* Chi. Trib., Jul. 16, 2016, http://www.chicagotribune.com/news/local/breaking/ct-murder-conviction-dropped-met-20160720-story.html.

¶ 44    In *People v. Reyes*, 369 Ill. App. 3d 1, 2 (2006), this court consolidated two appeals following codefendants' simultaneous trials before separate juries. Reyes was convicted of two counts of first degree murder, two counts of aggravated kidnapping, and home invasion and sentenced to life in prison without the possibility of parole. *Id.* Gabriel Solache was also convicted of two counts of first degree murder, two counts of aggravated kidnapping, and home invasion but was sentenced to death. *Id.* A third defendant, Adriana Mejia, pleaded guilty and was sentenced to natural life imprisonment. *Id.* at 3. Solache's sentence was commuted to natural life in prison and his convictions and sentences were affirmed on appeal. *Id*. at 2 (citing *People v. Solache*, No. 1-03-1149 (2003) (unpublished order under Supreme Court Rule 23)).

¶ 45    According to trial court testimony, Reyes and Solache were involved in the murder of Mariano and Jacinta Soto and the kidnapping of their children. *Id.* at 3. The police found Mejia with the Sotos' children and arrested her, Reyes, and Solache. *Id*. at 4. The police took Reyes and Solache to a different police station for questioning. *Id*.

¶ 46    Reyes and Solache each gave written inculpatory statements to Guevara. *Id*. at 6. No physical evidence linked Reyes to the crime and no DNA matched his profile. *Id*. at 9. Prior to trial, defendants filed motions to suppress their statements, asserting that Detective Guevara

coerced them. *Id*. at 5. Specifically, Reyes alleged that Guevara obtained statements from him "as a result of physical, psychological and mental coercion." (Internal quotation marks omitted.) *Id*.

¶ 47    The trial court conducted a series of hearings on the motions to suppress. *Id*. At the hearing, Reyes testified that Guevara, in the multiple interviews he conducted, struck him, asked him why he had committed the crime, and threatened that he would "get the electric chair" if he continued to deny his involvement in the crimes. *Id*. Reyes, who had limited English proficiency, testified that he was unable to read or write, and that when he signed the written statement—which was in English—he did not know what it said. *Id*. at 6. Guevara also did not read Reyes his *Miranda* rights. *Id*. at 7.

¶ 48    Maria Rivera, a defense witness, testified that Guevara interviewed her in 1996 regarding a shooting near her house and that she did not see the individuals who did the shooting. *Id*. at 8. Guevara ordered her to identify a person in the lineup as one of the individuals who shot the victims. *Id*. Rivera told the assistant State's Attorney that Guevara told her to identify the person even though she had not seen that person commit the shooting. *Id.*

¶ 49    In August 2003, this court affirmed Solache's convictions and sentences (*People v. Solache*, No. 1-03-1149 (2003) (unpublished order under Supreme Court Rule 23)), and a few weeks later this court affirmed Reyes' convictions and sentences. *People v. Reyes*, No. 1-01-2875 (2003) (unpublished order under Supreme Court Rule 23). The court expressly rejected petitioners' claims that their statements were coerced, noting that the cases "hinge[d] almost entirely on credibility." (Internal quotation marks omitted.) *Reyes*, 369 Ill. App. 3d at 11. The court emphasized that it was not required to give more credence to petitioners' claim over Guevara's. *Id.*

¶ 50    In 2003, Reyes and Solache each filed a postconviction petition. Reyes sought relief based on ineffective assistance of counsel for failing to investigate the abuse by Guevara which rendered his inculpatory statement involuntary. Solache's petition was to similar to Reyes' petition and asserted 14 claims essentially contending that Solache's confession was the product of a beating by Guevara. In support, Solache presented what he termed "substantial new evidence that Detective Guevara has systematically used improper techniques, including excessive physical force, to coerce false statements from suspects and civilians." In Solache's view, this "new evidence" consisted of 23 allegations that "establish a clear pattern and practice of misconduct and abuse by Detective Reynaldo Guevara." (Internal quotation marks omitted.) *Id.* The trial court summarily dismissed both petitions as frivolous and patently without merit. *Id*. at 12.

¶ 51    Reyes and Solache each appealed. This court consolidated the two appeals and, in December 2006, we reversed the summary dismissals and remanded for second-stage postconviction proceedings because the petitions alleged the gist of a constitutional claim. *Id*. at 24.

¶ 52    On June 29, 2016, the circuit court found that Reyes and Solache had made a substantial showing that they were denied their constitutional right to due process by a preponderance of the evidence. The circuit court ordered new hearings on their motions to suppress.

"After reviewing the evidence in third-stage evidentiary proceedings, it is abundantly clear that, the uncontradicted accounts of these specific interactions entailing abuse, coercion and improper influence in addition to the negative inference drawn from Det. Guevara's assertion of his 5th amendment privilege against self-incrimination lend credence to petitioners' allegations of abuse and coercion. A majority of the new evidence presented by petitioners is credible and, given that those accounts are unrebutted, the new

evidence is conclusive enough to establish that the outcome of petitioners' previous motion to suppress would likely have been different. Had petitioners been armed with these multiple credible and unrebutted accounts of the incidents introduced in these proceedings at the time of their motion to suppress, the court would have likely rendered a different decision and excluded their statements from introduction during trial in protection of their right to due process. In order to determine whether petitioners' new evidence in support of their claim of abuse and coercion would render their confessional statements involuntary and, therefore, inadmissible at trial, a new motion to suppress hearing should be held." People v. Reyes, Nos. 98 CR 1244002, 98 CR 1244003 (Cook Co. Cir. Ct. June 29, 2016) (order granting hearing on motion to suppress).

The State has appealed this order.

¶ 53    Another case petitioner relies on is *People v. Almodovar*, 2013 IL App (1st) 101476. Robert Almodovar was convicted of first degree murder, attempted murder, and aggravated battery with a firearm, and sentenced to life. *Id.* ¶ 2. There was no physical evidence directly linking Almodovar to the crime scene. *Id.* ¶ 7. The State's case centered on the testimony of two surviving victims and their identification of Almodovar. *Id.* One of the witnesses testified at a hearing on the first postconviction petition that Guevara, prior to taking him to a lineup, showed him photographs of Almodovar, asked him to identify Almodovar in the lineup and told him not to mention that Guevara showed him the pictures. At the lineup, the witness said he recognized the two people who had been in the photos and pointed them out. *Id.* ¶¶ 42, 43. The other witness also testified at the hearing and reaffirmed her trial testimony.  She denied that Guevara did anything improper or suggestive regarding her identification of Almodavar nor did she observe

him do anything to improperly influence the other witness in his identification of the petitioner. *Id*. ¶¶ 48, 49.

¶ 54 We reversed the first-stage dismissal of the petitioner's successive postconviction petition because the allegations that Guevara used improper procedures to influence witnesses to identify the petitioner met the "cause and prejudice test" were sufficient to allow the petition to advance to the second stage. *Id*. ¶¶ 75, 79.

¶ 55 Th*e Almodovar* court found *Reyes*, 369 Ill. App. 3d 1, similar because Almodovar was convicted in large part through Guevara's investigative efforts. Almodovar alleged that the evidence used against him was obtained by Guevara through suggestive identification procedures and Guevara's pattern of abuse was established (*Almodovar*, 2013 IL App (1st) 101476, ¶ 64), and " 'any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced.' " *Id*. ¶ 67 (quoting *Reyes*, 369 Ill. App. 3d at 21). This similarity was sufficient to meet the cause and prejudice test to allow the petitioner to file a successive postconviction petition. *Id*. ¶ 75.

¶ 56 Thus, *Reyes* involved claims by the petitioners that Guevara abused them to obtain incriminating statements and the claim by a witness that Guevara improperly influenced her testimony and *Almodovar* involved a witness claiming improper conduct to obtain an identification. In both cases, Guevara denied all of these allegations of misconduct, putting Guevara's credibility squarely at issue in both cases. In contrast, in this case we are reviewing the dismissal of a second-stage postconviction petition where there is a complete failure to make a substantial showing of a constitutional violation involving Guevara's misconduct towards the petitioner, Rodriguez, Marrero, or any other witness that was involved in the trial that led to defendant's conviction in this case. Rather, Gonzalez urges us to assume that because Guevara

was guilty of misconduct in other cases, the same must be true in this case. Importantly, other than pointing to evidence in other cases, Gonzalez fails to identify with reasonable certainty the nature, source, character and availability of evidence of the same misconduct that allegedly occurred in his case. *Delton*, 227 Ill. 2d at 254.

¶ 57 Gonzalez points out, and we acknowledge, that as criminal cases in Cook County involving Guevara have been gradually coming to light, he has begun to invoke his fifth amendment privilege against self-incrimination in various criminal and civil litigation matters. For postconviction analysis purposes, after reviewing Gonzalez's appendix there is little doubt that Guevara was engaged in a pattern of improperly influencing witness identifications. There is no question the affidavits and transcripts appended to Gonzalez's amended postconviction petition highlighting Guevara's misconduct in other cases is sufficient to meet the standards for first stage review, which is a low threshold. *People v. Cummings*, 375 Ill. App. 3d 513, 516 (2007); *People v. Edwards*, 197 Ill. 2d 239, 244, (2001) (a court may summarily dismiss a petition at the first stage as frivolous or patently without merit if it fails to present the gist of a constitutional claim.) However, at the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *Rivera*, 2014 IL App (2d) 120884, ¶ 7. Gonzalez has failed to make a substantial showing of a constitutional violation.

¶ 58 We disagree with Gonzalez that he has satisfied the *Washington* standard of actual innocence: that the evidence in support of his claim here is new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *Washington*, 171 Ill. 2d at 479. The evidence offered by Gonzalez simply amounts to evidence of Guevara's misconduct in other cases. This proffered evidence is immaterial, it does not support a claim of actual innocence, and it would not have any bearing on this result on retrial in the absence of

evidence that Guevara engaged in similar misconduct in this case. Significantly, Gonzalez has not submitted any affidavits, or any other evidence for that matter, with his amended petition showing that Guevara engaged in any wrongdoing *in this particular case.* In fact, postconviction counsel acknowledges the absence of such evidence but argues that petitioner's case should advance to a third-stage evidentiary hearing in order to access the subpoena power available at the third stage to embark on a search for unknown and unidentifiable evidence that might tend to show that Guevara engaged in any wrongdoing in this case. That is not how the Post-Conviction Hearing Act works.

¶ 59    Postconviction counsel has advanced several theories to support petitioner's speculative position that Guevara improperly influenced the identification witnesses in this case. Counsel theorizes that because there are certain "hallmark features" present here that were also present in other Guevara misconduct cases, Guevara necessarily must have coerced, improperly influenced, and intimidated the two main witnesses in this case. First, postconviction counsel argues that Yesenia Rodriguez was exactly the type of witness Guevara preyed upon—a young teen who spoke Spanish. Second, counsel suggests that Yesenia Rodriguez, like other witnesses in other cases, changed her description of the shooter after being interviewed by Guevara; initially she described the assailant as a black-Hispanic, 18-to-20-years-old with a black jersey wrapped around his face that concealed his identity and then changed to a post-Guevara interview description of a thin white-Hispanic, between five-foot-seven and five-foot-ten inches with a white t-shirt tied around his head. The third "hallmark feature" counsel identifies is the lineup identification made by Marrero after a suggestive photo array (petitioner's photo was the only one of six that showed a man holding a placard with an arrest number on it and had a white

background.) Finally, counsel argued that the State only presented evidence that came directly or indirectly through Guevara.

¶ 60    While all of these "hallmark features" may in fact be common to *other documented cases that Guevara was involved in*, Gonzalez simply cannot overcome the fact that there are no affidavits, records, or supporting evidence filed in this proceeding evidencing Guevara improperly influenced, coerced, or intimidated any witness or improperly influenced any identification in this case. Without an affidavit, record, or other supporting evidence of misconduct related to a witness in this case, historical "hallmark features" of Guevara's misconduct are insufficient. "Generalized claims of misconduct [alleged by petitioner], without any link to [petitioner's] case, *i.e.* some evidence corroborating [petitioner's] allegations, or some similarity between the type of misconduct alleged by [petitioner] and that presented by the evidence of other cases of abuse, are insufficient to support a claim of coercion." *People v. Anderson*, 375 Ill. App. 3d 121, 137-38 (2007). In this case, there is no specific misconduct by Guevara alleged so there can be no similarity drawn to his documented misconduct that would support the conclusion that petitioner is entitled to a third-stage evidentiary hearing.

¶ 61    Gonzalez also argues that he attached "sworn testimony from Guevara himself who in the face of questioning about allegations of wrongdoing invoked his Fifth Amendment privilege to remain silent." Guevara may have invoked his constitutional privilege in other cases, but again, there is no indication that he did so in relation to this particular case.[1] In his brief, Gonzalez states there is material "new evidence that Detective Guevara would plead the Fifth Amendment in response to questions related to his investigation of Tony Gonzalez" because "during a recent deposition in the federal civil litigation, *Rivera v. Guevara*, et al., 12-cv-04428, Guevara pled the

---

[1] Gonzalez cites generally to the seven-volume supplemental record in support of this argument.

Fifth Amendment in response to every question regarding his conduct while employed by the Chicago Police Department, including the a [sic] question of whether he framed Tony Gonzalez." Similarly, at oral argument, postconviction counsel argued that, when deposed in the case of "Jaque Rivera" regarding his involvement in Gonzalez's case, Guevara invoked his fifth amendment privilege. Certainly, a negative inference may be drawn from a party's refusal to testify. See *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107. However, Gonzalez has made these allegations without including this deposition testimony with his postconviction petition and without any citation to the record here, thereby foreclosing further consideration of this point.

¶ 62   In *People v. Orange*, 168 Ill. 2d 138 (1995), the petitioner's amended postconviction petition was denied without an evidentiary hearing. At his trial, the petitioner testified specifically that his confession was coerced through physical torture. *Id.* at 145. The petitioner raised several issues in his amended petition, including ineffective assistance of trial counsel based on counsel's failure to investigate his torture claim. The petitioner claimed that had trial counsel subpoenaed police disciplinary files he would have discovered corroborative evidence of coercive activities at Area 2. According to the petitioner, when he requested an attorney during his interrogation at Area 2, the police struck him in the mouth, used electroshock, stuck needles in his buttocks, repeatedly squeezed his scrotum, and placed a bag over his head in their attempts to coerce his confession. *Id.* at 147. To support his claim, petitioner submitted numerous affidavits from watchdog groups detailing the misconduct of officers in Area 2 over a two-year period. *Id.* at 148.

¶ 63   The *Orange* court noted that trial counsel's deposition indicated an awareness of petitioner's claimed coercion and of the general Area 2 torture allegations but counsel chose not to pursue that issue. Moreover, the court found:

"the affidavits submitted by defendant in support of his amended post-conviction petition are generalized and do not support the claims of torture or coercion made by him in this case. Because generalized allegations of coercive activity in Area 2, without other evidence, would not establish that this defendant was coerced into confessing (*People v. Jones* (1993), 156 Ill. 2d 225, 245 (occurrences of past police brutality have no relevance to instant case)), we believe that it was not unreasonable for counsel to curtail his investigation." *Id*. at 150-51.

¶ 64 Unlike *Orange*, in this case there are no specific allegations that Guevara abused, coerced, improperly influenced, or intimidated petitioner or any witnesses involved in Gonzalez's conviction. Similar to *Orange*, petitioner here has made nothing but generalized, speculative allegations of coercion. See also *People v. Maxwell*, 173 Ill. 2d 102, 120-21 (1996) (holding that without some evidence that petitioner was injured, evidence of the treatment of other suspects, through reports of physical abuse and coercion of confessions at Area 2, could not alone be the basis for a postconviction evidentiary hearing); *People v. Hinton*, 302 Ill. App. 3d 614, 626 (1998) (Grieman, J., specially concurring) (rejecting petitioner's contention that he was entitled to an evidentiary hearing on his postconviction petition because he had new evidence which showed "systematic torture" at Area 2); *Hobley*, 182 Ill. 2d at 448-49 (1998) (postconviction petitioner's request to proceed to an evidentiary hearing denied finding "new evidence" consisting of the OPS report and transcripts of testimony from other alleged victims of abuse did not alter the court's determination that petitioner did not suffer injuries consistent with his claims of abuse); *People v. Murray*, 254 Ill. App. 3d 538, 553 (1993) (holding petitioner's allegations of abuse of other suspects were properly excluded because they were "general in nature"). Gonzalez's generalized, speculative allegations are insufficient to advance the amended petition to a third-stage hearing.

Petitioner simply has not established that there exists a sound basis for a third-stage evidentiary hearing to address whether he is entitled to relief based on a substantial violation of a constitutional right.

¶ 65    Had Gonzalez presented any evidence, however slight, that Guevara coerced, improperly influenced, or intimidated a witness in this case, similar to the misconduct evidenced in the petitions filed in *Montanez* and *Serrano* (witness recanted trial testimony and claimed coercion by Guevara), *Reyes* and *Solache* (petitioners claimed before trial and at trial that Guevara coerced incriminating statements and a witness claimed he was ordered by Guevara to identify petitioners in a lineup), or *Almodovar* (witness testified that Guevara showed him photographs of petitioner prior to a lineup and asked him not mention the suggestive procedure), a convincing argument would have been made to advance respondent's petition to a third-stage evidentiary hearing. Without any evidence whatsoever that any witness against Gonzalez was improperly influenced by Guevara, we find that the circuit court properly dismissed Gonzalez's actual innocence claim at the second stage.

¶ 66                                      *Brady* Violation

¶ 67    Does the petition establish a *Brady* violation?

¶ 68    Under *Brady v. Maryland*, 373 U.S. 83 (1963), prosecutors are required to disclose exculpatory evidence to the defendant. Members of the prosecution team are responsible for disclosing evidence of innocence, including witnesses' statements or physical evidence. To establish a *Brady* violation, a defendant must show that: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74

(2008). Furthermore, a defendant "must establish that he requested the evidence in question, and that the State in fact possessed it and failed to disclose it." *People v. House*, 141 Ill. 2d 323, 387 (1990).

¶ 69    Gonzalez argues that he is entitled to a third-stage evidentiary hearing because he made a substantial showing of a violation of his constitutional rights on his *Brady* claim where the State withheld evidence of Detective Guevara's pattern and practice of coercing and manipulating witness testimony. This evidence, Gonzalez claims, would have impeached Guevara's credibility and undermined the reliability of the witness identifications that were procured by Guevara.

¶ 70    Citing *Gauger v. Hendle*, 349 F. 3d 354, 360 (7th Cir. 2003), the State characterizes Gonzalez's assertion of the prosecution's obligations under *Brady* as "overreaching." The State asserts the prosecution had neither actual knowledge nor imputed knowledge of any wrongdoing by the police department as a whole, or Guevara in particular. The State argues that nevertheless, the evidence presented in Gonzalez's postconviction petition was not material and that Gonzalez cannot demonstrate his evidence of Guevara's conduct in other cases was "of such conclusive character that it will change the result on retrial of his case."

¶ 71    Gonzalez claims it was an "open and notorious secret" that Guevara framed suspects with coerced and manipulated identification testimony and argues that "much of the supporting evidence was known to the Cook County State's Attorney at the time of Gonzalez's retrial in 2003." He further states that "every allegation against Guevara set forth in the exhibits attached to Gonzalez's petition and summarized in the chart on page [sic] of this brief, was made prior to Gonzalez's retrial in 2003" and therefore the State's Attorney's office had actual knowledge of scores of allegations made against Guevara for fabricating false eyewitness identification testimony.

¶ 72    We reject Gonzalez's *Brady* claim. If what Gonzalez claims is true, that "every allegation against Guevara set forth in the exhibits attached to Gonzalez's petition and summarized in the chart on page (sic) of this brief, was made prior to Gonzalez's retrial in 2003" then that same information had to have been available to Gonzalez, particularly those cases that reached this court. See *Johnson*, 272 Ill. App. 3d at 479; *People v. Arcos*, 282 Ill. App. 3d 870 (1996). As Gonzalez has pointed out, it was an "open and notorious secret" that Guevara was known as someone who framed suspects with coerced and manipulated identification testimony. Furthermore, even if the information regarding Guevara's misconduct in other cases would have been useful for impeachment at trial, and even if the State should have disclosed it, it is not of such conclusive character that it would have changed the result of Gonzalez's case. See *People v. Collins*, 2013 IL App (2d) 110915, ¶ 16-18 (police officer's suspension for knowingly providing inaccurate information in an unrelated case could not be used as impeachment where the claim that the officer had a motive to testify falsely was speculative, remote, and uncertain.) As we have repeatedly stated, Guevara's misconduct in other cases is not relevant in this case where there are absolutely no allegations or evidence of coercion, improper influence, or manipulation of any witness or in the investigation that produced the identification testimony at trial. Therefore, we affirm the dismissal of Gonzalez's *Brady* claim at the second stage.

¶ 73                                    CONCLUSION

¶ 74    Based on the foregoing, we affirm the judgment of the trial court dismissing Gonzalez's amended postconviction petition at the second stage.

¶ 75    Affirmed.

¶ 76    PRESIDING JUSTICE HYMAN, dissenting, with opinion.

¶ 77    The overwhelming majority of police officers and detectives act ethically and with common goals of community safety and addressing criminal behavior. But a civil society cannot tolerate the few rogue police officers and detectives who pervert the system by using illegal and nefarious means to make arrests and secure convictions. Newly discovered evidence demonstrates Detective Guevara engaged in a pattern and practice of framing suspects by orchestrating false identifications against them. His unlawful and disgraceful conduct casts an ugly pall over any case he worked on, most notably between about 1982 and 2005, the year he retired with a full police pension.

¶ 78    A conviction corrupted by law enforcement misconduct must not be let to stand as it undermines the very core of the legal system and threatens the public's perception of the fairness and credibility of the entire criminal justice process. See *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 33 (Hyman, J, special concurrence) (procedural fairness, not actual outcome, has greater effect on how people view the legal system). There is more than enough here to reverse the trial court's dismissal of Gonzalez's amended postconviction petition at the second stage, and to order a third-stage evidentiary hearing. One need not see flames to know that there has been a fire.

¶ 79    Evaluation of Gonzalez's petition must be conducted in the context of other specific instances of Guevara's alleged professional misconduct during investigations. The documents filed by Gonzalez raise grave concerns about the decades of unsavory police tactics used by Guevara. The affidavit from retired Chicago police detective William Dorsch stated he served as a gang crimes officer for 14 years between 1971 and 1985. Dorsch's affidavit related an earlier instance where Guevara pointed out a photograph to a young female witness, telling her whom to identify as the perpetrator. Gonzalez also included documents relating to other cases alleging

misconduct by Guevara and a photocopy of the six-photo array that Guevara showed Marrero in the hospital.

¶ 80    The second stage of postconviction review tests the legal sufficiency of the petition. *People v. Domagala*, 2013 IL 113688, ¶ 35. Unless the record affirmatively refutes the petitioner's allegations, they are taken as true, and the question presented is whether those allegations establish or "show" a constitutional violation. *Id*. "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Id*. See *People v. Lee*, 2016 IL App (1st) 152425, ¶ 61 (petition dismissed at second stage because " 'no reasonable probability that the outcome of the proceedings would have been different' " even if affiants testified at an evidentiary hearing). The "affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *People v. Delton*, 227 Ill. 2d 247, 254 (2008).

¶ 81    Section 122-2 of the Act requires that a petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2004). This requirement establishes that the allegations in a postconviction petition are capable of objective or independent corroboration. *Delton*, 227 Ill. 2d at 254. When reviewing the dismissal of a petition, an appellate court looks to the allegations in the petition, construed liberally in favor of petitioner and in light of the record and transcript, to determine whether the petitioner has alleged sufficient facts to require an evidentiary hearing. *People v. Pittman*, 192 Ill. App. 3d 943, 946 (1989). While affirming the dismissal of a petition

without holding an evidentiary hearing, *Pittman* noted our supreme court held in *People v. Washington*, 38 Ill. 2d 446, 451 (1967), that where the issue was the right to an evidentiary hearing where the petition was not accompanied by the required supporting affidavits, the petition itself was a sworn statement by the accused and in the absence of anything in the record disputing the allegations, the accused was entitled to a hearing to determine truth or falsity. *Pittman*, 192 Ill. App. 3d at 948.

¶ 82     The majority notes the amended petition included an affidavit from Detective Dorsch and included a seven-volume appendix relating to several cases "alleging misconduct by Guevara," as well as a copy of the photographic array shown to Marrero. *Supra* ¶ 18. These cases do not simply "allege" misconduct; in every case the defendant prevailed on the issue. See *Johnson*, 272 Ill. App. 3d 479; *Cruzado*, 299 Ill. App. 3d 131; *Solache*, No. 1-03-1149; *Reyes*, 369 Ill. App. 3d 1; *Almodovar*, 2013 IL App (1st) 101476; *Montanez*, 2016 IL App (1st) 133726; *Serrano*, 2016 IL App (1st) 133493. The majority goes so far as to state the "hallmark features" of this case may "in fact be common to *other documented cases that Guevara was involved in*." (Emphasis in original.) *Supra* ¶ 60. Several intersecting features reappear including (i) the type of witness Guevara historically preyed on (Spanish-speaking teenager), who (ii) changed his or her description of the shooter after being interviewed by Guevara; (iii) a suggestive photo array shown to the other eyewitness; and (iv) no other evidence introduced at trial to corroborate the two eyewitnesses' testimony. Surprisingly, even though the majority recognizes "there is little doubt that Guevara was engaged in a pattern of improperly influencing witness identifications," the majority holds these "hallmark features" are insufficient to advance to the third stage of an evidentiary hearing. *Supra* ¶ 57.

¶ 83    The majority summarizes the several cases all with a common thread—Guevara investigated the crimes that occurred. *Johnson*, 272 Ill. App. 3d 479; *Cruzado*, 299 Ill. App. 3d 131; *Solache*, No. 1-03-1149; *Reyes*, 369 Ill. App. 3d 1; *Almodovar*, 2013 IL App (1st) 101476; *Montanez*, 2016 IL App (1st) 133726; and *Serrano*, 2016 IL App (1st) 133493. *Supra* ¶¶ 37-56. It is significant that the majority opinion states, "*Serrano* also noted that the petitioner offered into evidence a statement from another witness that corroborated claims that Guevara used violence and other inducements to obtain false testimony from the purported witness against Serrano and Montanez." *Supra* ¶ 42. This occurred during the evidentiary hearing on the postconviction petition. At this stage in this case, no affidavit or further documentation would change what happened during *this investigation* because the two eyewitnesses and one detective who testified have not voluntarily come forward. Each witness's testimony was interwoven in the one narrative that Gonzalez was guilty based on photographic identification followed by a live lineup. And Guevara was the detective. At an evidentiary hearing Gonzalez could subpoena witnesses and proffer evidence. Without an evidentiary hearing to explore Dorsch's statements and subpoena Guevara, I believe this court runs the real risk of dooming a possibly innocent man and damaging public trust and confidence in the legal system by rationalizing away a hearing on the extent of Guevara's activities in this case.

¶ 84    In 2011, when we reversed the trial court's summary dismissal of Gonzalez's petition at the first stage and remanded for second-stage proceedings we stated: "With the news of the verdict in another case involving Detective Guevara, defendant has offered facts to support a legal theory of his actual innocence. This evidence is non-cumulative because it has not been presented in another form or suggested earlier by other means. Moreover, the evidence, taken as true and liberally construed, also is material and of such conclusive character that it would probably

change the result on retrial. Defendant's conviction was largely based on the eyewitness testimony of Rodriguez and Marrero, who were interviewed and shown pictures by Detective Guevara." *People v. Gonzalez*, 2011 IL App (1st) 093016-U, ¶ 23. This court further pointed to the State's contention that Juan Johnson, the defendant who prevailed in the federal case, was not involved in *Gonzalez*, having "misse[d] the mark" because "the purveyor of false identifications from Johnson's case was Detective Guevara, who secured the identifications of [Gonzalez] in the instant case." *Id.* ¶24.

¶ 85    The majority gives short shrift to these compelling statements and merely notes the reversal of the summary dismissal, despite the means by which Guevara obtained confessions and witnesses' statements.

¶ 86    Significantly, Gonzalez included an affidavit from the same detective who came forward in *Montanez* and *Serrano*. *Supra* ¶ 18. Detective Dorsch stated that during the late "80's/early 90's" he was assigned to a homicide case with Guevara. They arranged a photographic array of possible suspects for two juvenile witnesses. When one witness hesitated to pick a photo, Dorsch witnessed Guevara point to one of the photographs and tell the witness "that's him." Dorsch was concerned and called Felony Review, but it approved the charges after independently interviewing the witness. The next day, Dorsch talked to the juvenile about the seriousness of the charges and the importance of his identification. The juvenile admitted he had not actually witnessed the shooting. Dorsch immediately contacted the assistant State's Attorney and all charges against the suspect were dropped.

¶ 87    Here, Guevara testified at both trials about his investigation and the statements of the two eyewitnesses. Guevara interviewed Rodriguez at her apartment on the day after the shooting.

-32-

Guevara stated Rodriguez told him that the shooter had a black shirt tied around his head that did not conceal his face.

¶ 88    Rodriguez testified that police who responded to the scene interviewed her in Spanish. She told police the shooter was a male Hispanic but she did not see his face because he had a black shirt wrapped around his head that concealed his face.

¶ 89    Marrero's blood alcohol level two hours after the shooting showed he had been drinking heavily. Marrero was still hospitalized when Guevara interviewed him and showed him a six-photo array. Five of the six photographs had dark backgrounds and no numbers visible; Gonzalez's picture was the only photograph with numbers showing underneath his face and a white background. From this unduly suggestive array Marrero identified Gonzalez as the gunman. In the next few days, Guevara interviewed Rodriguez, a 15-year-old girl who was shown mug shots from a "gang book." About two weeks later, Gonzalez was arrested. Guevara arranged a lineup and testified Rodriguez and Marrero were together for about 10 minutes before looking at the lineup but viewed the lineup separately. Admitting this was poor police procedure, Guevara testified he did not "see anything wrong with that." Gonzalez was the only person in the lineup whose picture had been identified by both witnesses.

¶ 90    "*Regardless of how the initial misidentification comes about*, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent *** courtroom identification." (Emphasis added.) *Simmons v. United States*, 390 U.S. 377, 383-84 (1968). Other than Marrero and Rodriguez, there was no other evidence presented even tending to incriminate Gonzalez.

¶ 91    Our system should afford defendants recourse when their convictions rest solely on questionable eyewitness identifications. It is regrettable that the criminal justice system,

particularly in Cook County, has seen lengthy episodes of witness intimidation and coerced confessions by law enforcement. Record million dollar settlements have been reached between the City of Chicago and wrongfully convicted persons. To paraphrase the majority, "how does any of that relate to *this case*?" It is this—the same detective who has been responsible for multiple wrongful convictions investigated this case and interviewed the two witnesses who later identified Gonzalez. The cases summarized by the majority involve Juan Johnson, Jose Montanez, Armando Serrano, Arturo Reyes, Gabriel Solache, and Robert Almodovar, whose wrongful convictions were based on evidence engineered by Detective Guevara.

¶ 92    The relevance of evidence that police officers who questioned the defendant in one case had coerced suspects in other cases must not be lost. It serves to inform the court that it cannot ignore the implications of egregious misconduct. As the court stated in *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997), "Here, evidence of other acts of brutality to obtain confessions could serve two purposes: First, it might prove intent, plan, motive, and a course of conduct of the officers—all relevant to [the defendant's] claim he was tortured. [Citation.] Second, evidence of other similar acts could be used to impeach the credibility of the Area 2 police officers who will testify at the hearing."

¶ 93    And, regarding Guevara, individually, we have said, "In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." *Reyes*, 369 Ill. App. 3d at 21 (applying the test enunciated in *People v. Patterson*, 192 Ill. 2d 93, 145 (2000) (test of "new," "material," and "likely change the result upon retrial" to a first-stage proceeding)).

¶ 94    Finally, the majority's rejection of Gonzalez's *Brady* claim flips the prosecution's responsibility for disclosure of exculpatory evidence to a defendant. *Supra* ¶ 72. The majority

states the same information regarding allegations against Guevara was available to Gonzalez, citing *People v. Johnson*, 272 Ill. App. 3d 479 (1995), and *People v. Arcos*, 282 Ill. App. 3d 870 (1996). First, in neither *Johnson* nor *Arcos* was there any allegation of witness intimidation or coercion. Guevara testified for the prosecution, but only as to his part in the investigations. Certainly, however, by the time of Gonzalez's second trial, the State and the Chicago police department were well aware of Guevara's activities in multiple cases. The State failed to tender exculpatory evidence of Guevara's complaint history prior to Gonzalez's retrial in 2003. The failure of the prosecution to turn over potentially impeaching information about Guevara violated *Brady* requirements.

¶ 95    The majority also places the responsibility on a defendant to " 'establish that he requested the evidence in question, and that the State in fact possessed it and failed to disclose it.' " *Supra* ¶ 68 (quoting *House*, 141 Ill. 2d at 387). In *House*, the State had disclosed what it had been provided by the hospital and was unaware that hospital nurses' notes pertaining to a victim's condition also existed. The supreme court held the State was not under a duty to discover and disclose the notes. More importantly, possession and control of the information was not imputed to the State's Attorney's office. We must not extrapolate the supreme court's refusal to impose on the State an imputed knowledge of nurses' notes about a hospitalized witness to the facts at issue here.

¶ 96    To this point, the State does have imputed knowledge of police records. The prosecution cannot escape its duty under *Brady* by contending that the suppressed evidence was "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). As the United States Supreme Court explained in *Kyles*, "any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the

police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id*.

¶ 97    Apparent in this case is the insurmountable obstacle that there were only two eyewitnesses who cannot be expected to come forward to supply an affidavit supporting Gonzalez. Similarly, in *People v. Williams*, 47 Ill. 2d 1, 4 (1970), the petitioner alleged that his constitutional rights had been violated because of misrepresentations which had been made to him by his attorney while the State contended that the petition was insufficient to entitle the petitioner to a hearing because it was not accompanied by supporting affidavits. The *Williams* court, in rejecting the State's argument, stated that the only affidavit that the petitioner could possibly have furnished, other than his own sworn statement, would have been that of his attorney who allegedly made the misrepresentation to him, and that the difficulty in obtaining such an affidavit was self-apparent. The *Williams* court noted that to construe the Post-Conviction Hearing Act so strictly as to require an accompanying affidavit would be to defeat the purpose of the Act by denying the petitioner a hearing on the factual issues raised by the pleadings. The supreme court elaborated in *People v. Collins*, 202 Ill. 2d 59 (2002), stating "requiring the attachment of 'affidavits, records, or other evidence' will, in some cases, place an unreasonable burden upon post-conviction petitioners." *Id*. at 68. The same principle applies with equal, if not increased force, to Gonzalez.

¶ 98    This court has been repeatedly called on to review postconviction petitions in cases involving Chicago police department officers accused of misconduct in the course of criminal investigations. Only the "truth-finding" purpose of a third-stage evidentiary hearing can help to negate this awful legacy, as it has done for others in situations similar to that of Gonzalez. The trial judge at a third-stage evidentiary hearing determines the credibility of witnesses, decides the weight to be given testimony and evidence, and resolves any evidentiary conflicts. *Domagala*,

2013 IL 113688, ¶ 34. The factual record requires the granting of a third-stage hearing. So does the law. And, so does the credibility of the criminal justice system.