2016 IL App (1st) 133726
No. 1-13-3726

SECOND DIVISION
June 7, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 93 CR 1817303 |
| | ) | |
| JOSE MONTANEZ, | ) | |
| | ) | Honorable Maura Slattery Boyle |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE SIMON delivered the judgment of the court, with opinion.
Justices Neville and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal is taken from a directed finding that was entered in a postconviction proceeding stemming from a murder case 22 years ago. The principal witness from the trial has since submitted an affidavit that the trial testimony he gave was "false in all respects" and it was coerced by the detectives investigating the murder. A number of other witnesses have provided testimony that they were coerced to falsely implicate people in crimes by the same detectives. At

their joint evidentiary hearing, Montanez[1] and his codefendant Serrano presented profoundly alarming acts of misconduct in the underlying investigation and prosecution, all of which warrant closer scrutiny by appropriate authorities. Because we find that, when the evidence is viewed in the light most favorable to petitioner, Montanez has met his burden to go forward on an actual innocence claim, we reverse and remand. Any other result would work a palpable injustice.

¶ 2                                          BACKGROUND

¶ 3     On February 5, 1993, Rodrigo Vargas was found shot to death. Vargas was in his own driveway sitting in his van with the motor running. Neighbors had heard shots fired about an hour and a half earlier. Vargas's body was examined by the Cook County medical examiner's office, which determined that his death was a homicide resulting from multiple gunshot wounds. When he died, the victim still had his wallet with $190. One neighbor, Gary Shoop, indicated that he was awakened by the sound of several gunshots and looked out his window to see a car traveling away quickly. He identified the car as a brown sedan, a General Motors' make. The timeline of the investigation and what occurred during the investigatory period is hotly disputed by the parties.

¶ 4     Wilda Vargas, the victim's wife, originally told the investigators that she had no idea who would want to kill her husband. At trial, Wilda testified that the night before the murder, she was out running errands with her husband and children. They stopped at a bank and then proceeded to a gas station. Wilda said that while they were parked at a gas station and her husband was inside paying, a cream-colored four-door car with a brown top pulled in behind them, blocking them in.

---

[1]The defendants in this case are Jose Montanez, Armando Serrano, and Jorge Pacheco. Jorge Pacheco was acquitted. Serrano was convicted along with Montanez and has also filed a postconviction petition. The trial court held a joint evidentiary hearing for Montanez and Serrano, but each filed a separate appeal. The opinion adjudicating Serrano's appeal, *People v. Serrano*, 2016 IL App (1st) 133493, overlaps significantly with this opinion and is being filed concurrently.

She testified at one point that an occupant of the vehicle entered the gas station while her husband was inside. At another point, she testified that petitioner entered the gas station after her husband had already paid and exited the store. Because they had just left the bank, Rodrigo had cash, about $350. When Rodrigo came back to his car and it was still blocked in, he was agitated and honked the horn and cursed before the other car drove off. The subject car followed them for a period after they left the station.

¶ 5    Wilda testified that she had a good opportunity to view petitioner from a few feet away, and she identified petitioner in open court as the person who went inside the gas station. She originally identified a codefendant, Armando Serrano, as the driver but then switched her identification to petitioner. Wilda at one point testified that four days or so after the murder, February 8 or 9, she was accompanied by detectives Earnest Halvorsen and Reynaldo Guevara as they went back to the subject gas station. She later testified that this took place four months after the murder. Wilda and the detectives drove around the area to look for the vehicle she had seen the night before the murder, and she testified that she was able to identify the car parked at a residence in the neighborhood. The car she identified belonged to petitioner.

¶ 6    Another individual, Francisco Vicente, also testified against the defendants. Vicente is an admitted heroin addict and had four felony cases pending against him at the time. He was also concurrently a State's witness in two other murder cases being investigated by Detective Guevara in which the perpetrators supposedly confessed their crimes to him. While he was incarcerated on other charges, he reportedly told detectives Halvorsen and Guevara that the three defendants in this case had confessed to him. His testimonial narrative was that around 8 or 9 the same morning that Rodrigo Vargas was murdered, he came across defendants, whom he knew. Vicente testified that

he saw that defendants had a gun, and their conversation revealed that defendants were upset because they had unsuccessfully attempted to rob someone and in the fallout they had to kill him. Vicente testified that petitioner then said that defendants had seen a Mexican guy at a gas station the night before, and he pulled out a big wad of money so they decided to rob him. They waited until the next day to attempt the robbery since his wife and children were in the car that night.

¶ 7 Vicente ultimately received the mandatory minimum sentence of 9 years for his pending felony cases despite facing up to 100 years in prison. While in prison, Vicente received perks like cigarettes, a radio, home-cooked meals, and other things not generally available to inmates.

¶ 8 Detective Halvorsen also testified in the State's case. Halvorsen stated that he was questioning Vicente as a witness in another investigation when Vicente revealed that he had information regarding the murder of Rodrigo Vargas. It was June 2, 1993, about four months after the murder. It was just the two of them in the room. Halvorsen had heard unsubstantiated rumors on the street that someone by the name of "Pistol Pete" was involved in the Vargas murder. Vicente claimed that the rumored information was correct and that the "Pistol Pete" involved was petitioner and that petitioner's co-offenders in the murder were "Mando" and "Jordan." Halvorsen claimed that through his database he was able to identify Mando as Armando Serrano and Jordan as Jorge Pacheco, both of whom would later become petitioner's codefendants. Halvorsen claimed that later that day he told Guevara about the information gleaned from Vicente. Halvorsen's testimony was that it was at this point that the detectives visited Wilda Vargas, drove with her to the gas station, and then drove her around the area, where she identified petitioner's car as the one that had been behind them at the gas station the night before the murder.

¶ 9 Halvorsen testified that he also received a call around this time from Sergeant Minghey.

Minghey purportedly told Halvorsen that an individual being held by the police, Timothy Rankins, had claimed to be an eyewitness to Rodrigo Vargas's murder. Halvorsen testified that he and Guevara interviewed Rankins and, to verify his story, they drove in the direction of Vargas's home with Rankins accompanying them to test if Rankins could have really been an eyewitness. When they approached, Halvorsen testified, Rankins pointed to Vargas's home as the place where he had witnessed the murder. Rankins testified before a grand jury about what he apparently witnessed, but did not testify at trial.

¶ 10    No eyewitness testimony was presented at trial nor was there any physical evidence admitted. When making his ruling, the trial judge remarked that "were it not for the testimony of Vicente, there wouldn't have been much evidence here. His testimony is crucial." The trial judge found the three defendants guilty of murder but later reversed his own decision and acquitted Pacheco.

¶ 11    On May 26, 2004, Vicente completed an affidavit in which he recanted his trial testimony. He averred that his testimony at trial was "false in all respects." Going point by point, Vicente attested that the testimony he gave was supplied to him entirely by Detective Guevara and that he agreed to give the testimony as a result of threats, physical coercion, and promises of leniency for his own crimes. Vicente averred that he was also given money and received special treatment in prison in return for supplying false information in this case and in others at the behest of Guevara.

¶ 12    Petitioner filed a postconviction petition a few months later and his codefendant Serrano filed one about a year after the recantation. Petitioner's postconviction petition had 15 exhibits attached. The exhibits consisted of: Vicente's recantation affidavit, a statement from Timothy Rankins recanting his supposed eyewitness testimony offered during the investigation and to the

grand jury, and affidavits or other forms of sworn statements from at least 10 different witnesses swearing that Guevara had abused them, coerced them into giving false testimony, or committed some other kind of investigatory misconduct. A Cook County judge denied the State's motion to dismiss the postconviction petitions and advanced them to the third stage of postconviction proceedings for an evidentiary hearing. The cases were transferred to a new judge on October 1, 2009, but the evidentiary hearing did not take place until May 15, 2013.

¶ 13    At the evidentiary hearing, Detective Guevara invoked his fifth amendment right, refusing to answer on grounds that he might incriminate himself. His attorney spoke on his behalf and indicated that she had advised him not to testify because, among other things, he had been sued for "similar allegations of misconduct" in the past. The trial she referenced in particular was one in which a $21 million verdict was entered for the complaining plaintiff for police misconduct. When questioned in detail about the allegations of misconduct in this investigation, Guevara refused to answer each question, invoking his fifth amendment protections. Similarly, Vicente invoked the fifth amendment and refused to give testimony to back up his sworn recantation. There were several indications that he feared prosecution for having previously perjured himself at defendants' trial. Vicente did not take the opportunity to repudiate the content of the affidavit. Vicente told the court that he feared for his safety, and he was escorted from the building.

¶ 14    Petitioner offered into evidence the transcribed statement of Timothy Rankins. Rankins described how Guevara used violence in an attempt to get him to incriminate the defendants in this case. Rankins testified about his reluctance to give the false testimony against them and the beating he suffered at the hands of Guevara and others. He swore that Guevara and Halvorsen gave him photographs of the three defendants in this case and a written statement and told him to study the

material and, after some more beating, told him to sign the statement. Rankins claims that the statement he signed was false in its entirety, as was his testimony before the grand jury. Rankins also corroborated claims made by Vicente averring that the two of them were housed in the same protected prison block, receiving cigarettes, money, and the option of privately hosting female guests. Rankins swore that he and Vicente worked together to learn the false statements. Rankins stated that he eventually refused to provide false testimony at trial, though the detectives tried multiple times to persuade him to testify.

¶ 15    Valentin Gomez testified at the evidentiary hearing that he and Vicente were co-offenders in a case in 1995 or 1996, a year or so after Vicente testified against defendants. While they were incarcerated, Gomez was concerned that Vicente was in protective custody because he had flipped in the case they had together. Gomez testified that Vicente assured him that, no, he had not flipped in their case, but had falsely implicated these defendants in order to get a deal in his own pending cases. According to Gomez's testimony, three or four years later, he and Vicente came into contact again and they again discussed that Vicente had lied in this case. Gomez testified that Vicente expressed his desire to come clean about giving false testimony against defendants. Gomez, however, never reported the content of his conversations with Vicente to anyone prior to him being contacted in connection with these postconviction proceedings.

¶ 16    Petitioner called witnesses and introduced other sworn testimony at the evidentiary hearing in an attempt to establish Guevara's pattern of police misconduct. William Dorsch, a retired Chicago police department detective, testified about a case he worked on with Guevara a couple of years before this case came about. In that case, the detectives were conducting a photographic lineup with two supposed eyewitnesses. Dorsch testified that when one of the witnesses seemed

unable to make an identification, Guevara pointed to one of the pictures and said "that's him." The witness then agreed with Guevara's suggestion and went on to identify the person in a live lineup. Dorsch conducted the lineup with the second witness by himself, and the witness was unable to make an identification. The witnesses later admitted that their statements were false and that they were being paid by a third party. The charges against the accused were dropped. Dorsch, however, did not remember many of the particulars of the case such as the names of those involved. Dorsch also never reported the incident to his superiors and had since begun to work as an investigator with the Innocence Project and received compensation for his work.

¶ 17     David Velasquez testified that Guevara drove him to rival gang territory and announced his presence, prompting Velasquez to promise to cooperate. Velasquez testified that when they got back to the station, the detectives beat him until he signed a statement falsely claiming that he was an eyewitness to a murder. However, Velasquez also testified that he had originally implicated a member of his own gang, and, had he not recanted, he surely would have been killed. Adolfo Frias Munoz's affidavit was accepted into evidence. In it, Munoz swore that he and his nephew were violently interrogated by Guevara. Munoz was told his wife would also be beaten and arrested, so he confessed. Gabriel Solache testified in a different proceeding that Guevara punched him until he confessed to a murder he did not commit, causing him to suffer permanent hearing loss as a result. In that same case, Arturo Reyes testified that Guevara slapped him and had him sign a statement in English leading him to believe it would free him from custody. But, Reyes did not speak English and the statement turned out to be a confession.

¶ 18     Continuing, Wilfredo Rosario's testimony from prior proceedings was introduced in which Rosario testified that Guevara threatened to lock him up with rival gang members unless he

testified in multiple murder cases. Rosario averred that the testimony that he used for his witness narratives was provided by Guevara. Graciela and Anna Flores testified in a different proceeding that Guevara came to their house to execute a search warrant and violently attacked Graciela. Julio Sanchez and Louis Figueroa supplied affidavits swearing that they were pressured by Guevara to identify an individual in a lineup whom they knew was not the perpetrator. Those affiants stated that Guevara and Halvorsen showed them photographs of the person they were supposed to pick out of the lineup or told them under which number in the lineup the person the detectives wanted selected would be located. Virgilo Muniz's affidavit was offered. He averred that he falsely accused another man of murder because Guevara told him if he did not, he would be charged instead.

¶ 19    The trial court barred the testimony of 12 other individuals who would have averred that they were abused or otherwise witnessed misconduct by Guevara. The trial court's reasoning for not allowing the evidence was that the testimony was too temporally remote or not similar enough to the allegations in this case.

¶ 20    The trial court also barred testimony from Wilda Vargas, the victim's wife and an important witness at trial. As an offer of proof, petitioner stated that if Wilda had been allowed to testify, she would have testified that she was unable to identify a vehicle when she drove with the detectives, but that Guevara took her to the location of the vehicle and told her that it was the car from the gas station. It was him, not her, who identified the vehicle. Wilda would have also testified that Guevara falsely told her that some bullet holes in the subject car matched the ballistic testing done at the scene of her husband's murder when they, in fact, did not. The court found that the testimony that would have been offered by Wilda, as described by defense counsel, did not

warrant her testifying at the hearing.

¶ 21    At the close of the petitioner's case, the State moved for a directed finding. The trial court took the matter under advisement. About three months later, the court issued a 25-page written ruling granting the State's motion for a directed finding. In doing so, the trial court concluded that "[t]he evidence presented by petitioners in the instant case, taken in [the] light most favorable to the petitioners entirely fails to support their allegation that Detective Guevara forced Francisco Vicente to falsely implicate petitioners in first degree murder and attempted armed robbery." This appeal followed.

¶ 22                                    ANALYSIS

¶ 23    To obtain postconviction relief on the basis of a claim of actual innocence, a petitioner must present new, material, noncumulative evidence of such a conclusive character as would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 84. When we consider whether the evidence is "conclusive" we look at whether the new evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Id*. ¶ 97. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2014)) gives the postconviction court wide latitude to receive proof by affidavits, depositions, oral testimony, or other evidence. *People v. Ruiz*, 177 Ill. 2d 368, 383 (1997).

¶ 24    Where, as here, the trial court grants a directed finding after petitioner's case at a third-stage evidentiary hearing, we review its decision *de novo*. *People v. Andrews*, 403 Ill. App. 3d 654, 659 (2010) (when no fact finding or credibility determinations are involved in a decision regarding a third-stage postconviction petition, we review *de novo*); *People v. Connolly*, 322 Ill. App. 3d 905, 918 (2001) (a ruling on a motion for a directed finding is a question of law subject to

*de novo* review). The parties agree that *de novo* review is appropriate. When presented with a motion for a directed finding, the trial court is obliged to construe the evidence in the light most favorable to the nonmovant and may only grant the motion when the evidence so favors the nonmovant that a contrary ruling could never stand. *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 136. Thus, the question here is: has the petitioner made a *prima facie* showing that the new evidence presented, taken in a light most favorable to him, would probably change the result if the case was retried? *Id.*; *Coleman*, 2013 IL 113307, ¶ 84.

¶ 25    To start, petitioner meets the situational requirement of presenting new, material, noncumulative evidence. The State[2] did not move for a directed finding on the absence of any of those characteristics, and the trial court's ruling was not based on a lack of presenting the proper type of evidence, but instead upon a supposed failure to meet the evidentiary burden.

¶ 26    At trial, the only direct evidence of petitioner's guilt was Vicente's testimony. Vicente supplied what amounted to a confession from defendants including details of the crime that swayed the fact finder. The trial judge commented, "were it not for the testimony of Vicente, there wouldn't have been much evidence here. His testimony is crucial." That "crucial" testimony is now entirely repudiated in a sworn statement by the person who gave it. The witness now claims the testimony was "false in all respects." Detail by detail Vicente averred that the testimony he gave at trial was fed to him by Guevara, was coerced, and was not true.

¶ 27    There is not a large body of published case law in Illinois dealing with recantation evidence. As in nearly every jurisdiction, Illinois courts have stated that recantations of trial

---

[2]We note that the State's brief is riddled with so many careless errors that the brief appears to have never even been proofread. Many of the points the State tries to make to support its arguments are also truly baffling. The failure to submit a presentable brief in a case of this magnitude is disconcerting.

testimony are to be viewed with suspicion. *People v. Lawson*, 65 Ill. App. 3d 755, 756 (1978). But a survey of persuasive cases throughout the country reveals that recantation statements should not simply be dismissed without further analysis. See, *e.g.*, *Lopez v. Miller*, 915 F. Supp. 2d 373, 402-08 (E.D.N.Y. 2013) (analyzing at length the considerations federal courts have given to recantation testimony); *United States v. Ramsey*, 726 F.2d 601, 604-05 (10th Cir. 1984) (where the witness himself files an affidavit averring that his trial testimony was false, the trial court must at least decide if the recantation is to be believed). That notion is especially valid in a case like this where the trial court is obligated to assess the evidence in a light most favorable to petitioner.

¶ 28    Even at the time of trial there were reasons to be concerned about the veracity of Vicente's testimony. He is an admitted heroin addict. He had a lengthy criminal history. He received a sentence of 9 years for four felony cases when he was facing 100 years in prison—a significant incentive to give testimony favorable to the government. Now, looking at all of those concerns with the additional sworn statement from the witness that the testimony was false, that previously *crucial* testimony is undeniably called into question. The recantation contains significant additional corroboration. Among other items discussed in more detail below, Timothy Rankins testified that he was coerced by Guevara to give false testimony against the defendants in this case and that he and Vicente rehearsed the testimony together and received special treatment in prison. Valentin Gomez's sworn statement that Vicente admitted years before the recantation that he had falsely testified in this case aids to rebut any indication of a recent fabrication. The totality of the corroboration evidence not only establishes the admissibility of the recantation, it demands that the evidence be weighed to assess its veracity.

¶ 29    In directing a finding for the State, addressing Vicente's recantation, the trial court found

that "Petitioners have failed to present any evidence that Detective Guevara engaged in misconduct in their cases, and have been unable to present any evidence that Francisco Vicente provided false testimony at the behest of Detective Guevara." The trial court ignored Vicente's affidavit and Rankin's transcribed statement, both of which provide *direct* evidence of misconduct in this case and of Vicente providing false evidence at the behest of Guevara. Petitioner presented sworn evidence from the very witness who claims to have been under the influence of Guevara's misconduct in this very case. In addition, Timothy Rankins supplied a statement that Guevara tried to coerce him into giving false testimony in this case. He swore that the detectives gave him photographs of the three defendants and a written statement to sign. Rankins testified that the statement he signed was false in its entirety as was his testimony before the grand jury. Rankins also corroborated claims made by Vicente, averring that the two of them were housed in the same protected prison block and that they received cigarettes, money, and other benefits in return for implicating these defendants. When Rankins eventually decided he would not falsely implicate defendants at trial, the detectives took away his special privileges and tried multiple more times to solicit his false testimony.

¶ 30    The trial court found it especially significant that Vicente was cross-examined for well over 100 pages of the transcript, explaining that because petitioner failed to "show the very basis for [his] claim," his claim is "meritless." Then, finishing its assessment of the worthlessness of Vicente's recantation, the trial court stated that "the evidence in the present case so overwhelmingly favors the State that no contrary verdict based on that evidence could ever stand." We profoundly disagree. Without Vicente's trial testimony, even the judge that presided over the trial would disagree with that characterization. That judge stated that without it, "there wouldn't

have been much evidence here," so it is completely unclear how the other evidence in the case could now somehow be characterized as "overwhelming." When Vicente's recantation affidavit is examined under the proper directed finding standard, it is impossible to say that it does not even bolster petitioner's claim.

¶ 31    The trial court also failed to draw an adverse inference from Detective Guevara's invocation of the fifth amendment. Proceedings under the Post-Conviction Hearing Act are civil in nature. *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). The privilege against self-incrimination may be invoked in any proceeding, civil or criminal, in which the witness reasonably believes that the information sought could be used in a subsequent criminal proceeding against him. *People v. Houar*, 365 Ill. App. 3d 682, 688 (2006). However, when the privilege is invoked in a civil proceeding, the trial court may sometimes draw an adverse inference that, had the questions been answered truthfully, the answers would have been damaging to the person invoking the privilege. See *id*. at 689. The issue is not addressed in the trial court's order.

¶ 32    While we need not expressly decide whether an adverse inference is ultimately warranted in this case, it is something the trial court should have at least considered at the directed finding stage. *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107. Guevara refused to answer probative, detailed questions about his misconduct in this very case.

¶ 33    The trial court then moved to the evidence offered by petitioner in his attempt to establish a pattern of misconduct by Guevara, going one by one through the statements offered by the other individuals. The trial court separately held that each of the individual's allegations against Guevara "fails to support petitioners' claim," typically because the evidence was either too remote in time or did not describe misconduct similar enough to that alleged in this case. Thus, the trial

court held, none of the evidence supported petitioner's claim.

¶ 34    Petitioner offered or was prepared to offer evidence of Guevara's misconduct and witness coercion from more than 20 people, all from within a 10-year period. The trial court gave no compelling reason to entirely write off that evidence as either not admissible or not persuasive because of when the misconduct was said to have occurred. Although the specific allegations are not, nor would they be expected to be, 100% the same in every claim of misconduct, all of the allegations are that Guevara used coercion to get witnesses to make false statements. Many of the purported occurrences are actually quite similar. Almost all of the purported victims are Hispanic and many did not speak fluent English, giving Guevara the opportunity to coerce them more easily. The types of deception, the physical abuse described, and the other methods employed are not so disparate to convincingly demonstrate some sort of widespread fabrication of accusations against Guevara. There was even evidence from a Chicago police detective that worked alongside Guevara who testified about Guevara's willingness to procure false identifications in a manner corroborative of the other allegations made by the proposed witnesses here. As we stated in another case concerning Guevara's misconduct, "In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." *People v. Reyes*, 369 Ill. App. 3d 1, 21 (2006). For the trial court to find all of that evidence totally unworthy of any credit when it was required to view the evidence in a light most favorable to petitioner is truly puzzling.

¶ 35    Certainly the proffered pattern of misconduct at least somewhat supports and corroborates petitioner's claim of misconduct as it relates to Vicente's sworn statement. The temporal connection to the evidence that Guevara coerced Vicente in this case and the similarity of the

various allegations may go to the weight or credibility of the evidence, but it is still supporting evidence. In its order, the trial court states that "[i]n ruling on directed verdict, 'a court does not weigh the evidence, nor is it concerned with the credibility of witnesses.' " However, the trial court did just that. The purpose of all of this evidence about Guevara's purported misconduct was to support the sworn recantation by Vicente. As we observed in another case dealing with Guevara's history "it is at least arguable that, if the [fact finder] had known about Detective Guevara's history of improperly influencing witnesses, they might have [weighed testimony differently]." *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 79. If the evidence offered here does not meet the postconviction evidentiary threshold at the directed finding stage, then it is hard to imagine the threshold ever being met.

¶ 36    The State argues that the trial court's ruling should stand because petitioner did not meet his burden of going forward on a claim of actual innocence. In support of that argument, the State contends that there was evidence at trial that rebuts Vicente's false recantation and the false allegations leveled against Guevara. In particular, the State points to the trial testimony of Detective Halvorsen in which Halvorsen states that he was alone with Vicente when Vicente first implicated the defendants here. According to Halvorsen's testimony, it was only after Vicente gave evidence against defendants to him that Guevara even got involved. Therefore, the State claims, Vicente's affidavit is totally refuted. We do not find this argument persuasive.

¶ 37    Even though this is the State's principal argument on appeal, the trial court's lengthy written order does not in any way rely on Halvorsen's testimony. The trial court had no reason to disbelieve Vicente's recantation in favor of Halvorsen's trial testimony at the directed finding stage under the particular circumstances. In many of the cases where an individual has accused

Guevara of misconduct, Halvorsen is accused of participating or at least being involved in the case. He is not some disinterested witness, especially after the myriad allegations of misconduct have been brought to light. Halvorsen's trial testimony about his one meeting with Vicente does not discredit all the postconviction evidence to the contrary when the postconviction evidence is viewed in the light most favorable to petitioner. If all of the evidence submitted in connection with this postconviction proceeding is proved to be true, including the accusations against Guevara, Halvorsen's trial testimony may well be consigned to oblivion.

¶ 38     The State also falls into the same hole that the trial court did when it argues about the veracity of the affidavit. The State suggests that Vicente may have been compensated or something of the sort in exchange for his recantation by the Innocence Project or the Northwestern University students that procured the affidavit. But that is a matter for the State's case. It is an inappropriate argument where a directed finding was entered against petitioner. The State is free to explore the veracity of the affidavit, but that has no bearing on whether petitioner met his burden to defeat a motion for a directed finding. The State makes other claims such as that Rankins' statement "should be given little weight." But the trial court was not in any position to determine the amount of weight to give evidence at this stage in the proceedings. The State indicates that, had it not been given a directed finding, it would have "called many live witnesses to refute both the Vicente allegations and the collateral allegations in a hearing." Now it will have that opportunity.

¶ 39     The trial evidence that is not directly called into question by the postconviction evidence is extremely flimsy. The motive evidence is questionable because Wilda Vargas's trial testimony about whether petitioner had an opportunity to see the victim and his money while in the gas station was less than solid. The State's theory was that petitioner was in the store while her

husband was paying. But Wilda also at one point testified that her husband had already paid and exited the store before petitioner entered, which would vitiate the narrative that petitioner saw the money and decided to commit a robbery. Also, her husband was left with nearly $200 in his pocket when he was killed.

¶ 40    Wilda's testimony about observing petitioner's car when she was with the detectives is now all but refuted by her proferred testimony that the information was fed to her by Guevara. He supposedly told her which car to identify and then misled her about nonexistent ballistic evidence. The timing of when Wilda drove around with the detectives is also open to question. She originally testified that she drove around with the detectives and identified petitioner's car four days after her husband was killed, while the detectives' narrative was that she drove around with them several months after the murder. Wilda's identification testimony is also dubious. At the police station and in court, she made misidentifications of the defendants before settling on whom she saw and where she saw them. At trial, the judge commented that he found the majority of Wilda's identification testimony to be unreliable.

¶ 41    There were no eyewitnesses to the crime, and no physical evidence tied the defendants to the crime. No weapon was ever recovered nor were any proceeds of the supposedly intended robbery. Vicente was Guevara's key witness in two additional murder cases at the same time this case was pending. In all three cases, the perpetrators supposedly confessed their murders to this same heroin addict. At the risk of belaboring the point, in making his ruling at trial, the judge acknowledged that "were it not for the testimony of Vicente, there wouldn't have been much evidence here." Now, with everything presented at the postconviction evidentiary hearing, construed in the light most favorable to petitioner and with all inferences being drawn in his favor,

that lack of other evidence is distinctly concerning.

¶ 42    The corroboration of the new evidence and its consistency on key details, properly construed, is compelling. We have before us a recantation from the principal trial witness saying he was coerced by detectives, a partial recantation from the secondary witness (the victim's wife) saying she was misled by investigators, sworn statements from at least 20 individuals claiming that the investigators coerced them in a similar manner, and then the detective under suspicion coming to the hearing and invoking the fifth amendment in response to all of the pointed questions. At this stage in the proceedings, petitioner was required to make out merely a *prima facie* case that would cause the court to view the "evidence presented at trial in a different light and undercut[ ] the court's confidence in the factual correctness of the guilty verdict." *People v. Coleman*, 2013 IL 113307, ¶ 97. That has clearly occurred here. When all of the postconviction evidence is viewed in a light most favorable to petitioner, the trial court was wrong to say that no contrary ruling could ever stand.

¶ 43    We also vacate the trial court's evidentiary rulings based on the remoteness of Guevara's purported misconduct in other cases. That evidence should be allowed, consistent with our explanation in *Reyes* that "any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." *Reyes*, 369 Ill. App. 3d at 21. Of course, there are some limitations attendant to the preceding statement, but, based on the offers of proof made by petitioner, all of the proffered testimony about Guevara's purported misconduct should have been admitted. Furthermore, we vacate the trial court's ruling concerning the proffered postconviction testimony of Wilda Vargas. It is immensely relevant, and she should be able to testify about being manipulated by Guevara in this case. That testimony might very well

be the most important evidence in the case.

¶ 44     The final issue in this appeal is that petitioner suggests we should remove the postconviction judge from the case and assign the case to a different judge on remand. Petitioner argues that since the postconviction judge has already ruled that no contrary verdict could ever stand and since the judge has expressed a disregard for the evidence presented, it would be essentially worthless to send the case back to the same judge. We agree. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) gives a reviewing court, in its discretion, the power to reassign a matter to a new judge on remand. *People v. Tally*, 2014 IL App (5th) 120349, ¶ 43. Petitioner offered up an abundance of evidence to support his claim of actual innocence. The trial court turned a blind eye to much of the evidence and also refused to admit probative, admissible evidence that, when evaluated under the proper standard, is damning. Even where the court gave lip service to the standard it was supposed to apply, the court clearly did not adhere to that standard. The postconviction court gave the impression that it was flatly unwilling to consider the evidence offered by petitioner. See *Reyes*, 369 Ill. App. 3d at 25. Petitioner would be prejudiced were we not to assign the case to a new judge on remand. Therefore, in the exercise of our discretion under the supreme court rules, we find that the interests of justice would be best and most efficiently served by the case being assigned to a different judge on remand.

¶ 45                                    CONCLUSION

¶ 46     Accordingly, the trial court's judgment is reversed, and its directed finding in favor of the State is vacated. The case is remanded to the presiding judge of the criminal division of the circuit court with instructions that the case be assigned to a different judge to adjudicate the reinstated third-stage postconviction proceedings.

¶ 47    Reversed and remanded.