**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240689-U

Order filed June 9, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0689 Circuit No. 24-CC-0001 |
| | ) ) | Honorable |
| JOEL A. BRODSKY, | ) ) | Jessica Colon-Sayre and David M. Carlson, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The trial court's order prohibiting certain extrajudicial statements is vacated.

¶ 2     In this indirect criminal contempt case, defendant, Joel A. Brodsky, appeals from the trial

court's order striking his motion to dissolve an order prohibiting him from making certain

extrajudicial statements on the basis that the underlying order is an unconstitutional prior

restraint of speech. For the following reasons, we vacate the order and remand the cause for further proceedings.

¶ 3                                  I. BACKGROUND

¶ 4       The backdrop of this case is Brodsky's representation of Drew Peterson, who, in 2012, was convicted of murdering his third wife, Kathleen Savio, and was sentenced to 38 years in prison. Peterson's conviction and sentence were affirmed on direct appeal. *People v. Peterson*, 2015 IL App (3d) 130157, *aff'd*, 2017 IL 120331.

¶ 5                                  A. *Brodsky I*

¶ 6       Subsequently, on October 19, 2021, Peterson filed a *pro se* petition for postconviction relief under section 122-1 of the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2020)), alleging, *inter alia*, that Brodsky provided ineffective assistance of counsel, lied about his experience defending accused murderers, encouraged Peterson to engage with the media to increase Brodsky's fame and legal practice, responded harshly to the advice of cocounsel, and threatened to withdraw as lead counsel if Peterson testified at trial. (The postconviction petition remains pending in case No. 09 CF 1048).

¶ 7       As recounted in *People v. Peterson (Brodsky I)*, 2022 IL App (3d) 220206, ¶ 5, on May 17, 2022, WGN News, of Chicago, aired a television interview with Brodsky. WGN News also published a written article, titled "Drew Peterson's former attorney considers revealing killer cop's secrets," that included excerpts from Brodsky's television interview. See Ben Bradley & Andrew Schroedter, *Drew Peterson's Former Attorney Considers Revealing Killer Cop's Secrets*, WGN 9: WGN Investigates (May 18, 2022), https://wgntv.com/news/wgn-investigates/drew-petersons-former-attorney-considers-revealing-killer-cops-secrets/ [https://perma.cc/5BF8-6U9H]. In relation to the unsolved disappearance of Peterson's fourth

wife, Stacy Peterson (Stacy), the article quoted Brodsky as stating, " 'It's something that weighs on my conscience.' " *Id.* Brodsky was also quoted as asserting: " 'I would never do anything that would hurt a former client, but he's in prison, he's never getting out. So, if he's a man, he'd say "I'm done, here's what happened," so people can have closure.' " *Id.* Brodsky further stated, " 'I feel bad about *** [Peterson] still not taking responsibility and Stacy still being missing. I'm thinking about maybe revealing what happened to Stacy and where she is.' " *Id.* In addition, with respect to both Stacy and Peterson's third wife, Savio, Brodsky was quoted as broadly asserting, " 'I know everything about both of [Peterson's] wives—everything.' " *Id.*

¶ 8        The day after Brodsky's May 17, 2022, television interview, Peterson's counsel served Brodsky with an emergency motion in the postconviction proceeding for an order prohibiting the disclosure or dissemination of information obtained during his legal representation of Peterson. *Brodsky I*, 2022 IL App (3d) 220206, ¶ 6. Peterson argued that, in light of his ineffective assistance of counsel claim, Brodsky was a potential witness in the postconviction proceedings. *Id.* Thus, while Brodsky no longer provided legal representation to Peterson, the circuit court " 'ha[d] an interest in taking necessary actions to preserve the fairness and integrity of' " the postconviction process. *Id.* According to Peterson, " 'even the suggestion by [Brodsky] that [Peterson] made inculpatory statements would so drastically prejudice [Peterson] and taint any potential jury pool that a fair trial could never be had in this matter.' " *Id.* Peterson maintained that Brodsky's statements in the television interview revealed an intent " 'to disseminate and disclose the substance of communications allegedly had with *** Peterson' " that were " 'clearly *** privileged *** between a client and attorney.' " *Id.* Brodsky also suggested that, based on those communications, " 'he knows what actually happened to Kathleen Savio and Stacey [*sic*] Peterson.' " *Id.* In Peterson's view, the scenario created by Brodsky was without precedent and

3

in conflict with the Illinois Rules of Professional Conduct of 2010 and the canons of ethics applicable to attorneys. *Id.*

¶ 9    Following a hearing the next day—May 19, 2022—at which the prosecutor agreed with the position of Peterson's counsel, the trial court granted the emergency motion, finding, *inter alia*, that " 'any reasonable person would *** view [Brodsky's statements] as a threat to Mr. Peterson' " and described the ability to speak confidentially with an attorney as " 'sacrosanct' " and " 'a bedrock [principle] of our system.' " *Id.* ¶¶ 10-11. The court further noted that the General Assembly has established a right of " 'every single person in the State of Illinois *** to petition the Court post-conviction about claims that their constitutional rights have been violated,' " including for violations of the right to effective assistance of counsel. *Id.* ¶ 10. The court opined, " '[A] situation where an attorney would make a statement to the news media that it's about time *** [to] tell the truth almost goes directly to the claim that there was ineffective assistance of counsel. *Id.* It's astonishing that such a thing would happen[ ]' because 'it places the whole [postconviction] hearing procedure at risk.' " *Id.* Moreover, the trial court found that further statements by Brodsky to the news media " 'would make the whole [postconviction] process almost meaningless[] [and] would almost require a new trial on its face if such a conversation [between Brodsky and Peterson] was published outside of the courtroom.' " *Id.* ¶ 11. Accordingly, the trial court entered an order on May 19, 2022, providing:

> " 'Petitioner's Emergency Order is GRANTED, and Joel Brodsky is hereby enjoined from speaking about his representation of Mr. Peterson and from disseminating or disclosing any information regarding such representation, or any information obtained in the course of such representation, to any media outlet or to any individuals other than

4

his own counsel. This order to remain in effect until further order of this Court.' " *Id.* ¶ 12.

¶ 10 Brodsky filed a notice of appeal from the trial court's order pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017) (allowing an appeal from an interlocutory order granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction). In affirming, this court rejected Brodsky's argument that the May 19, 2022, gag order was an invalid prior restraint of speech. *Brodsky I*, 2022 IL App (3d) 220206, ¶ 42. Initially, we noted that the matter involved the broadly disseminated public statement of a former attorney in which he suggests that he may openly divulge confidential information disclosed to him by his former client, and was not a traditional free press case. *Id.* ¶ 35. Thus, guiding our analysis was Rule 3.6(a) of the Illinois Rules of Professional Conduct of 2010 (eff. Jan. 1, 2010), which prohibits a lawyer, who is participating in or has participated in the litigation of a matter, from making an extrajudicial statement when the lawyer knows or reasonably should know that it will be disseminated by means of public communication and would pose a serious and imminent threat to the fairness of an adjudicative proceeding in the matter, and the comments thereto, which delineate the types of conduct and publicity posing a serious and imminent threat to the fairness of a proceeding (see Ill. R. Prof'l Conduct (2010) R. 3.6 cmt. 5(1), (2), (4) (eff. Jan. 1, 2010)). Significantly, the comments explain that there are certain subjects posing a serious and imminent threat to the fairness of a proceeding, namely, subjects relating to, *inter alia*, "(1) the character, credibility, reputation or criminal record of a party ***"; "(2) in a criminal case or proceeding that could result in incarceration, *** the existence or contents of any confession, admission, or statement given by a defendant ***"; and "(4) any opinion as to the guilt or innocence of a defendant *** in a criminal case or proceeding that could result in incarceration." *Id.* We

concluded that Brodsky's statements, as a whole, related directly to these subjects and that Brodsky "could not be allowed to so brazenly threaten to disseminate, to the public, the contents of the privileged communications at issue in this case." *Brodsky I*, 2022 IL App (3d) 220206, ¶ 42. While recognizing that prior restraints should not be justified by mere possibilities, we gave Brodsky's statements "their obvious and unmistakable meaning" and found "the character of the present evil undeniable and its likelihood palpable," particularly given Brodsky's "obvious lack of respect for the attorney-client privilege." *Id.* ¶ 41.

¶ 11    We further determined that, given the particular statements made by Brodsky, the gag order was neither vague nor overbroad. *Id.* ¶ 43. In rejecting Brodsky's reliance on *Kemner v. Monsanto Co.*, 112 Ill. 2d 223 (1986), which held a gag order—prohibiting the defendant from communicating with the media about the case during trial—to be vague and overbroad, we noted the obvious distinction that the disclosures prohibited by the May 19, 2022, gag order are protected by the attorney-client privilege. *Brodsky I*, 2022 IL App (3d) 220206, ¶ 51. We reasoned that the gag order is clearly limited to information Brodsky obtained in the course of representing Peterson and that the gag order "is easily read to forbid exactly what Brodsky threatened to do—take his case to the media in violation of the attorney-client privilege—and no more." *Id.* ¶¶ 52-54. Moreover, while the order enjoining Brodsky from disseminating or disclosing any information obtained in the course of representing Peterson may appear broad in a vacuum, the injunction was not overbroad considering the underlying facts, *i.e.*, Brodsky's statement in the interview that he " 'know(s) everything about both of his (Peterson's) wives—everything' " and that Peterson was accused of causing Stacy's unavailability at trial and her hearsay statements were used against Peterson. *Id.* ¶ 45.

6

¶ 12         Finally, we rejected Brodsky's argument that the trial court failed to receive evidence or issue factual findings as to the clear and present danger or a serious and imminent threat to the fairness and integrity of a potential new trial were Peterson's postconviction petition successful. *Id.* ¶¶ 59-63 (quoting *Kemner*, 112 Ill. 2d at 244 (courts may " 'restrain parties and their attorneys from making extrajudicial comments *** *only* if the record contains sufficient specific findings *** that the parties' and their attorneys' conduct poses *a clear and present danger or a serious and imminent threat to the fairness and integrity of the trial.* [Citations.]' ") (Emphases in original.)). We noted that, while the trial court did not reiterate verbatim the language set forth in *Kemner*, the requisite findings were implicit and obvious in the trial court's statements in the record, including a recitation of Brodsky's statements to the media, a discussion of the threat to the sanctity of the attorney-client privilege, and pointed observation regarding the risk to the integrity of Peterson's pending postconviction proceeding. *Id.* ¶¶ 60-63.

¶ 13                                        B. *Brodsky II*

¶ 14         On March 1, 2024, the State (joined by the Will County assistant public defender representing Peterson) filed a petition to adjudicate Brodsky in indirect criminal contempt for having violated the March 19, 2022, gag order by appearing on Ashley Banfield's February 28, 2024, NewsNation podcast (Banfield Show). The petition, filed in case No. 24 CC 0001 (*Brodsky II*), alleged that Brodsky knowingly and willfully violated the May 19, 2022, gag order (enjoining him from "speaking about his representation of Mr. Peterson and from disseminating or disclosing any information regarding such representation, or any information obtained in the course of such representation, to any media outlet or to any individuals other than his own counsel") by appearing live on the Banfield Show and speaking about the case and his

7

representation of Peterson. The petition cited a link to a YouTube video of Brodsky's appearance on the Banfield Show.

¶ 15    On March 6, 2024, Brodsky filed a motion to dismiss the petition for indirect criminal contempt on the basis that the petition was deficient on its face. See 725 ILCS 5/114-1(a)(8) (West 2022) ("The charge does not state an offense."). Namely, Brodsky argued that, given the appellate court's statement in *Brodsky I* (that "the gag order is easily read to forbid exactly what Brodsky threatened to do—take his case to the media in violation of the attorney-client privilege—and no more"), the contempt petition fails to state an offense because it merely alleged that Brodsky appeared on the Banfield show and spoke about Peterson's case and his representation of Peterson, not that Brodsky violated the attorney-client privilege. Brodsky also challenged the continued validity of the May 19, 2022, gag order. Brodsky's motion was ultimately continued to April 4, 2024.

¶ 16    Meanwhile, at a March 6, 2024, hearing, the prosecutor advised the trial court that it was considering the case a serious indirect criminal contempt and that Brodsky should be given full felony admonitions. The trial court proceeded to advise Brodsky that he was entitled to an attorney and that the penalties could include time in the penitentiary and probation or conditional discharge as well as a fine up to $25,000. Brodsky responded that, while he understood an admonishment of his "right to silence and the right to a jury and everything else," the contempt petition merely alleged a minor contempt carrying only a potential for less than six months' confinement and a $500 fine. Regardless, the trial court responded that it was putting Brodsky on notice that, "if the allegations are proven[,] it is about as serious of a violation as a lawyer can commit in the course of any sort of legal proceeding, either in or outside of court." The trial court then stated, "I may do this to protect you from yourself on this one. I'm going to order that you

8

not talk to anybody until April 1st or until further order of the Court. I'm not saying I'm putting an outright gag order on you until that date \*\*\*." The trial court later added, "I'm going to order that you not discuss your representation of Mr. Peterson in this matter until further order of Court." The court characterized what it was saying as a new order that Brodsky "simply not make any comments regarding your representation of Mr. Peterson until further order of Court, which may or may not be April 1st, okay?" During a colloquy about the scope of the order, the trial court advised Brodsky that he could talk to the press about "anything you want other than Mr. Peterson," to which Brodsky responded, "I doubt they're interested in anything else."

¶ 17　　　　Subsequently, at an April 1, 2024, hearing, the prosecutor advised the trial court that, minutes after being in court on March 6, 2024, Brodsky continued to speak to the press in violation of the court's order. Specifically, the prosecutor reported that Brodsky stated, " 'Judge Carlson clearly has a strong feeling about attorney/client privilege. I mean I think that certain situations you should be able, it shouldn't apply. I argue that there should be an exception to the attorney/client privilege when there is a missing person and the guy is never getting out of jail. But you know, so far the Court hasn't agreed with me on that.' " Brodsky responded that his statement had nothing to do with Peterson's representation and that he was merely saying there should be an exception to the attorney-client privilege in certain situations.

¶ 18　　　　Following briefing, at the April 4, 2024, hearing on Brodsky's motion to dismiss the contempt petition, Brodsky argued that the contempt petition was facially defective because it failed to specify what Brodsky had said during the Banfield interview to violate the May 19, 2022, gag order. The prosecutor responded that Brodsky "knows his only value to the media is to disclose what he cannot and may not disclose" and quoted the violative content of the interview, as follows:

9

"And here's what [Brodsky] says [during the Banfield interview], 'But, you know, Drew—Drew doesn't realize, you know, he's sitting there, saying, hey, I made a mistake because I wouldn't let him testify. What he doesn't re—well, he realizes, but he doesn't realize what he is saying is there's one reason a lawyer can't let a client testify if the client wants to testify, and that's if the lawyer knows the guy's going to get up on the stand and lie. So basically Drew is confirming, uh, you know, uh-uh, I can't, uh, I'm trying to walk right up to the line and not cross it, but, uh, what Drew is doing is basically, uh, affirming that, um, I know, uh, what happened.' "

¶ 19    The trial court denied Brodsky's motion, finding that the petition put Brodsky on notice of the May 19, 2022, gag order and the conduct that violated the order. Noting that whether the conduct actually violated the order beyond a reasonable doubt was a separate issue, the trial court set a discovery schedule. The trial court further advised that one of Brodsky's conditions of pretrial release was that he not "talk about anything dealing with the case or what happens in here outside of those doors." In response to Brodsky's comment that such a condition was unconstitutional, the trial court clarified that there are two different orders in this case—the recent March 6, 2024, order that Brodsky not discuss his representation of Peterson, and the May 19, 2022, gag order entered in Peterson's postconviction proceeding. The trial court later said that "my order is that you not talk to anybody outside of these walls" and that it was referring to "public comment" about the case. The court's April 4, 2024, docket entry states in relevant part:

"Pretrial Release Order and all previous conditions of release are ordered to stand. Defendant is ordered to not make any comments regarding Drew Peterson and any proceedings as it relates to this Indirect Criminal Contempt to the media or anyone

10

outside the courtroom. Previously entered [May 19, 2022,] GAG Order entered by Judge Burmila is ordered to stand."

¶ 20　　On May 1, 2024, Brodsky filed a motion to remove conditions of pretrial release, arguing that there was no legal basis to support the imposition of such conditions in a contempt proceeding. Following briefing and argument, on June 5, 2024, the trial court noted that, "[b]ecause it is a serious contempt request, the defendant is entitled to all of the constitutional rights that a criminal defendant is entitled to" and that, accordingly, the court has the inherent power to order pretrial release conditions. The trial court further found that it was not unreasonable for the court to restrict Brodsky's communications regarding the contempt case and the previous gag order. Noting that the prosecution had the burden of proving the contempt case beyond a reasonable doubt and that Brodsky had the right to a jury trial, the trial court explained that it wanted to keep all communications regarding the contempt case inside the courtroom "to prevent any kind of unfairness to both sides on having him be able to even leak out this information that's being contained here in the courtroom."

¶ 21　　On September 16, 2024, Brodsky filed, *inter alia*, a combined motion to dissolve the May 19, 2022, gag order and the April 4, 2024, order. Brodsky maintained that the orders amounted to an unconstitutional prior restraint on his free speech and argued that there was no imminent threat of harm to Peterson because, according to Brodsky, the only issue that is being litigated in the postconviction proceeding is Peterson's fitness. On November 20, 2024, following argument, the trial court entered an order denying Brodsky's motion to dissolve the May 19, 2022, gag order and found that "[t]here is nothing new here that I am hearing that hasn't been visited and addressed by the appellate court." In response to Brodsky's argument that he did not understand the scope of the order, the trial court stated, "I don't know what your attorney-client, your

11

discussions between you and Mr. Peterson were. Only you do. So use your legal experience. Use your education. Use your common sense to determine what that is."

¶ 22    Regarding Brodsky's motion to dissolve the April 4, 2024, order, on December 5, 2024, following argument, the trial court initially denied the motion "to protect the sanctity of a fair and impartial jury, if we were to select one in this case." The trial court noted that the purpose of the order "is not only to protect you but also the underlying issue is protecting the interest of any future proceedings regarding your [former] client which stems from your alleged violation." However, following the State's argument, the trial court agreed that the April 4, 2024, order was not, as Brodsky claimed, a new gag order and thus struck Brodsky's motion to dissolve the order.

¶ 23    Brodsky timely filed notices of interlocutory appeal from both orders pursuant to Rule 307(a)(1). (In *People v. Peterson*, 2025 IL App (3d) 240671-U, we affirmed the trial court's denial of Brodsky's motion to dissolve the May 19, 2022, gag order).

¶ 24                                    II. ANALYSIS

¶ 25    On appeal from the trial court's order striking Brodsky's motion to dissolve the April 4, 2024, order, in the contempt proceeding, Brodsky maintains that the order amounts to a gag order and challenges the constitutionality of the order on the basis that it amounts to an impermissible prior restraint of speech and that it is unconstitutionally vague and overbroad.

¶ 26    Before turning to the merits, however, we address the State's argument that we lack jurisdiction over this appeal. According to the State, the trial court did not grant, modify, refuse, dissolve, or refuse to dissolve or modify an injunction, as required for jurisdiction over an interlocutory appeal pursuant to Rule 307(a)(1). Rather, the State argues that the trial court explicitly found that no gag order had in fact been entered on April 4, 2024, and thus granted the State's motion to strike Brodsky's motion to dissolve the purported gag order. The State

12

characterizes the trial court's order to refrain from speaking about the case as simply a condition of Brodsky's pretrial release and contends that Brodsky forfeited his ability to challenge the conditions of his release by failing to appeal the trial court's denial of his motion to remove conditions of pretrial release in accordance with Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024).

¶ 27    However, we construe the substance of the order, not the form, in determining what constitutes an appealable injunctive order under Rule 307(a)(1). *In re A Minor*, 127 Ill. 2d 247, 260 (1989). "Actions of the circuit court having the force and effect of injunctions are still appealable even if called something else." *Id.* As we noted in *Brodsky I*, "[c]ircuit court orders that restrain the making of extrajudicial comments are construed as injunctions." *Brodsky I*, 2022 IL App (3d) 220206, ¶ 31. Here, in the April 4, 2024, order, the trial court explicitly ordered Brodsky not to make any comments regarding Peterson and the contempt proceedings to the media or anyone outside the courtroom. Accordingly, regardless of its label or whether also a condition of Brodsky's pretrial release, the trial court ordered the restraint of extrajudicial comments. We thus construe the April 4, 2024, order as an injunction. See *Kemner*, 112 Ill. 2d at 235 (a temporary gag order, which prohibited the defendant from talking to the press until judgment was entered, was reviewed under Rule 307(a)(1)); *People v. Kelly*, 397 Ill. App. 3d 232, 265-66 (2009) (a "Decorum Order," which enjoined the parties' attorneys and witnesses from speaking on certain topics, was reviewed under Rule 307(a)(1)); *In re J.S.*, 267 Ill. App. 3d 145, 147 (1994) (a gag order, which prohibited the parties and their attorneys from discussing the facts in the underlying action with members of the news media, was reviewed under Rule 307(a)(1)).

13

¶ 28    Rule 307(a)(1) provides that an appeal may be taken to this court from an interlocutory order "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017). The rule has been interpreted to include interlocutory appeals from orders that refuse to modify or dissolve existing injunctions. *Craine v. Bill Kay's Downers Grove Nissan*, 354 Ill. App. 3d 1023, 1025 (2005). In striking Brodsky's motion to dissolve the April 4, 2024, order, the trial court in substance refused to dissolve an existing injunction. "Courts have the inherent power to review, modify, or vacate an interlocutory order at any time before final judgment." *Doe v. Illinois Department of Professional Regulation*, 341 Ill. App. 3d 1053, 1059 (2003). Accordingly, we have jurisdiction over Brodsky's appeal from that order pursuant to Rule 307(a)(1) and thus turn to Brodsky's underlying constitutional challenge to the April 4, 2024, order.

¶ 29    We note that the scope of this interlocutory appeal is limited to Brodsky's challenge to the validity of the April 4, 2024, order. Whether Brodsky violated the May 19, 2022, gag order is not at issue in this appeal, as the petition for indirect criminal contempt against Brodsky for violating the May 19, 2022, gag order has not yet been adjudicated and remains pending in the trial court. We review the constitutionality of a court-ordered prior restraint on speech for an abuse of discretion. *Same Condition, LLC v. Codal, Inc.*, 2021 IL App (1st) 201187, ¶ 30. Likewise, we review for an abuse of discretion the decision to grant or deny the requested relief in an interlocutory appeal. *Peterson*, 2022 IL App (3d) 220206, ¶ 2.

¶ 30    In the April 4, 2024, order at issue in this appeal, the trial court ordered Brodsky "to not make any comments regarding Drew Peterson and any proceedings as it relates to this Indirect Criminal Contempt to the media or anyone outside the courtroom." The order amounts to a prior restraint of speech. See *Brodsky I*, 2022 IL App (3d) 220206, ¶ 31 (quoting *Chicago Council of*

14

*Lawyers v. Bauer*, 522 F.2d 242, 248 (7th Cir. 1975)) ("A prior restraint has been described as 'a predetermined judicial prohibition restraining specified expression.' "). As our supreme court noted in *Kemner*, while a prior restraint of speech is not unconstitutional *per se*, there is a heavy presumption against its validity. *Kemner*, 112 Ill. 2d at 243. The proponent of an injunction amounting to a prior restraint on speech bears a heavy burden of demonstrating a justification for the imposition of such restraint. *Brodsky I*, 2022 IL App (3d) 220206, ¶ 31 (quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). Ultimately, "to achieve the delicate balance between the desirability of free discussion and the necessity for fair adjudication, free from interruption of its processes," a trial court "can restrain parties and their attorneys from making extrajudicial comments about a pending civil trial *only* if the record contains sufficient specific findings by the trial court establishing that the parties' and their attorneys['] conduct poses a *clear and present danger or a serious and imminent threat to the fairness and integrity of the trial*." (Emphases in original.) *Kemner*, 112 Ill. 2d at 244; see also *Kelly*, 397 Ill. App. 3d at 267 (discussing standard in criminal case).

¶ 31        Moreover, an order that restricts the parties' and their attorneys' first amendment rights in the interest of a fair trial must be neither vague nor overbroad. *Kemner*, 112 Ill. 2d at 244. Prior restraints of extrajudicial comments are vague if they are not clearly defined so as to provide fair warning to those affected by the order and to prevent infringements upon constitutionally protected activity. *Id.* at 247. Prior restraints of extrajudicial comments are overbroad if they curtail speech that does *not* present a threat to a fair trial or are not "narrowly drawn so as not to prohibit speech within first amendment rights that would not be prejudicial to a fair trial." *Id.* at 246-47 (discussing cases where prior restraints of extrajudicial comments were found to be overbroad).

15

¶ 32        Brodsky likens the April 4, 2024, order to the gag order held unconstitutional in *Kemner*. The lawsuit in *Kemner* arose out of tank car derailment and chemical spill in Missouri. *Id.* at 228. The plaintiffs sued, *inter alia*, Monsanto Company, seeking damages for injuries caused by exposure to the chemical produced by Monsanto, which was allegedly contaminated with dioxin. *Id.* A month after the trial commenced, the National Institute of Occupational Safety and Health (NIOSH) held a news conference in St. Louis, Missouri, wherein NIOSH officials announced that a former St. Louis trucking company employee had developed a rare form of cancer possibly linked to dioxin. *Id.* at 232. Thereafter, Monsanto sent a letter to numerous media organizations in and around St. Louis, explaining its role in the lawsuit, decrying the " 'exaggerated NIOSH pronouncements,' " and attempting to " 'sensitize' " the news agencies " 'to the need to be careful, responsible and accurate in the way dioxin subjects are reported in the future.' " *Id.* at 232-33. The trial court granted the plaintiffs' request for injunctive relief and ultimately issued an order, providing:

> " '1. Defendant Monsanto Company shall not in any press release, background statement, interview, publication or any other contact with the media, by any agent, servant, employee, attorney or independent contractor, mention this case or intimate its existence or its trial or any particular facts or circumstances or positions of parties concerning it until judgment is entered by this Court. The term "media" includes local, national and multi-national, print and electronic.
>
> 2. Defendant Monsanto Company is prohibited from taking any action outside this courtroom that is calculated to or is reasonably foreseeable to influence any juror in this cause.

16

3. Monsanto Company is in no way prohibited from engaging in the current national debate on dioxin apart from the specific restrictions attributable to the integrity of the administration of justice in this case.' " *Id.* at 235.

¶ 33 On appeal, our supreme court held that the order was an unconstitutional prior restraint of free speech. *Id.* at 250. The court reasoned, *inter alia*, that there was no substantial evidence to justify a finding that a serious and imminent threat to the fair administration of justice existed because of Monsanto's communication with the media. *Id.* at 245. Indeed, the plaintiffs did not allege that any jurors saw or were influenced by the press coverage, and the mere possibility of such was insufficient to support the requisite finding. *Id.* The court also reasoned that the gag order was vague in that it failed to specify in an adequately clear fashion the proscribed conduct and utterances and failed to provide "a fair and reliable warning of its portent." *Id.* at 245-49. The court further noted that the prohibition of "all mention" of the case, regardless of whether such expression constitutes a serious and imminent threat to the administration of justice, was overbroad in that the terms of the gag order could encompass a press release by Monsanto that posed no serious threat to the plaintiffs' ability to have their case tried before an unprejudiced jury. *Id.* at 246-47.

¶ 34 We agree that the April 4, 2024, order is comparable to the order held unconstitutional in *Kemner*. Specifically, the order prohibits in broad fashion "any comments regarding Drew Peterson *and any proceedings as it relates to this Indirect Criminal Contempt to the media or anyone outside the courtroom*." (Emphases added.) As in *Kemner*, the order here essentially prohibits all mention of the contempt case, regardless of whether such expression constitutes a serious and imminent threat to the administration of justice, and is overbroad. See *id.* Indeed, at oral argument, when questioned as to whether the order would prohibit Brodsky from stating, for

example, that the contempt proceeding was motivated by the State's Attorney's dislike of Brodsky (to be clear—a hypothetical statement *not* alleged to have been made), the State conceded that the order would sweep such a statement within its reach. Asked whether precluding Brodsky from critiquing the contempt prosecution was constitutionally defensible, the State implicitly conceded it was not. Accordingly, we hold that the order is overbroad under *Kemner* and thus vacate the order and remand this case for further proceedings.

¶ 35        We note that Brodsky also argues that the State has not specified what Brodsky said in the Banfield Show that violated the May 19, 2022, gag order. The State requests that we take judicial notice of the video of the interview and cites Brodsky's statements from the interview as reflective of Brodsky's continued suggestions to the media about purported confessions or other statements made by Peterson to Brodsky. However, as we noted at the outset, whether Brodsky violated the May 19, 2022, gag order is not at issue in this appeal. In this interlocutory appeal, we are merely reviewing the validity of the April 4, 2024, order. Brodsky further argues that the prosecution has engaged in abusive litigation tactics, including failure to produce discovery, and requests sanctions. Again, this is an interlocutory appeal under Rule 307(a)(1); as such, Brodsky's arguments are beyond the scope of our jurisdiction.

¶ 36        As a final matter, Brodsky requests that we exercise our discretion under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) and reassign the matter to a new judge on remand. See *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 44. According to Brodsky, the record reflects that no reasonable person would believe that he could receive a fair hearing before the same judge. We disagree. As the State points out, adverse rulings alone, even if erroneous, are almost never sufficient to support a claim of judicial bias. *Lesher v. Trent*, 407 Ill. App. 3d 1170, 1176 (2011). Rather, to succeed on a judicial-bias claim, a litigant must show either a personal bias

18

stemming from some source other than the litigation or comments made in the course of proceedings that reflect such a high degree of favoritism or antagonism so as to render a fair judgment impossible. *Id.* The record does not support a judicial-bias claim. We therefore decline Brodsky's request to reassign this case to a new judge on remand.

¶ 37                                    III. CONCLUSION

¶ 38        For the reasons stated, we vacate the April 4, 2024, order of the circuit court of Will County and remand the cause for further proceedings.

¶ 39        Vacated and remanded.